UNITED STATES Of America,
Plaintiff–Appellee,

v.

Charles BIGHEAD, Defendant–Appellant.

No. 95–30157.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 4, 1996.

Decided Nov. 18, 1997.

William I. Lee, Federal Public Defender, Tacoma, WA, for defendant-appellant.

Helen J. Brunner, Assistant United States Attorney, Seattle, WA, for plaintiff-appellee.

Before: FLETCHER, JOHN T. NOONAN, Jr. and RYMER, Circuit Judges.

PER CURIAM.

Charles Bighead appeals his conviction of one count of sexual abuse of a minor, in violation of 18 U.S.C. §§ 2243, 1153. We have jurisdiction, 28 U.S.C. § 1291, and affirm.[1]

I

At trial, Bighead's daughter, Roxanne Bighead Eison, testified that Bighead began fondling her in or about 1982 after she began living with her parents on an Indian reserva-

---

1. We resolve two additional issues in a memorandum disposition filed contemporaneously with this opinion.

tion. She was seven years old at the time. Roxanne also testified that in or about 1987, when she was approximately eleven years old, Bighead forced her to have sexual intercourse with him and paid her money after the act. She testified that over the course of the next several years, Bighead continued to have sexual intercourse with her and would often pay her money following these acts. In 1993, when she was seventeen, she rejected his overtures.

That same year, shortly before her eighteenth birthday, she confided in a tribal police officer about what had transpired with Bighead. This was her first disclosure to an adult about the instances of sexual abuse. She explained that she delayed reporting what happened because she was scared of Bighead, and because she felt ashamed, and like a prostitute. Although this was her first disclosure to an adult, Roxanne previously had confided in two of her childhood friends: once when she was in sixth grade, and once when she was sixteen years old.

Defense counsel's cross-examination of Roxanne focused primarily on her delayed reporting, as well as on some inconsistencies in her testimony. In rebuttal, the government called Tasha Boychuk, director of forensic services at the Children's Advocacy Center, as an expert witness. Boychuk testified about general characteristics of child sexual abuse victims, specifically the timing of their reporting and their recollection of details.

## II

■ Bighead argues that the district court erred in admitting Boychuk's expert testimony about certain characteristics of child sexual abuse victims, because it lacked foundation under Fed.R.Evid. 702 and under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). He faults Boychuk's opinion as it went beyond her own observations, *cf. United States v. Hadley*, 918 F.2d 848 (9th Cir.1990), but lacked the bases required by Fed. R.Crim.P. 16; and he contends that the district court should have determined whether her theories could be tested, were subjected to peer review and publication, had the potential for error, and were generally accepted in the field.

■ Boychuk was called as a rebuttal witness after the victim's ability to recall and to recount the incidents of sexual abuse vigorously had been challenged on cross-examination. Boychuk did not testify about the facts of this case, or about the particular victim, whom she had never examined. Rather, she testified about "delayed disclosure" and "script memory," which are typical characteristics she has observed among the more than 1300 persons she has interviewed who say they are victims of child abuse. As such, her testimony falls within *Hadley*. It holds that where an expert testifies to "general behavioral characteristics" based upon the expert's "professional experience" and does not rely on "novel scientific technique" or employ "any special techniques or models," *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923) is not implicated. 918 F.2d at 853. *Daubert* has supplanted the *Frye* test that had previously been followed uniformly. However, we have already indicated that *Daubert*'s tests for the admissibility of expert scientific testimony do not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory. *United States v. Cordoba*, 104 F.3d 225 (9th Cir.1997). Boychuk's testimony consisted of her observations of typical characteristics drawn from many years experience interviewing many, many persons, interviewed because they were purported victims of child abuse. That it was not an abuse of discretion to permit it follows from *Cordoba*, where we held that expert testimony on narcotics traffickers' modus operandi was not "scientific testimony" subject to *Daubert*, because it involved "specialized knowledge, not scientific knowledge" and required no inference or assertion derived from a scientific method. *Id.* at 230. *See also McKendall v. Crown Control Corp.*, 122 F.3d 803, 806 (9th Cir. 1997). We do not agree with Bighead that *Hadley* doesn't apply simply because the expert referred in passing to "studies, literature and specific syndromes." Her opinion was based on her own observations. In any event, she could have been, but was not, cross-examined about the nature and extent of her reliance on any other source.

■ Bighead also argues that Boychuk's testimony did not assist the trier of fact, and

was more prejudicial than probative, because it infringed on the jury's province to determine credibility. We see no improper buttressing, as Boychuk testified only about "a class of victims generally," and not the particular testimony of the child victim in this case. *Hadley,* 918 F.2d at 852; *see also United States v. Antone,* 981 F.2d 1059, 1062 (9th Cir.1992). By the same token, Boychuk's testimony had significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony. The district court did not abuse its discretion in permitting the expert to testify, even though two other witnesses testified about actual disclosures as early as 1984 and 1990, since Boychuk's testimony went to disclosure for the purpose of assistance. Regardless, the jury was free to determine whether the victim delayed disclosure or simply fabricated the incidents.

AFFIRMED.

NOONAN, Circuit Judge, dissenting.

Charles Luther Bighead, Jr., has been convicted of a horrible crime, a crime that the government described to the jury that convicted him as the rape of his thirteen-year-old daughter, Roxanne. Throughout the proceedings, and on the witness stand, he steadily maintained his innocence. He was convicted on the basis of Roxanne's testimony, fortified by the testimony of the government's expert, Tasha Boychuk. The latter's testimony was critical: she was the government's last witness and the government ended its rebuttal to the jury by invoking her words. Her testimony was also inadmissible. I begin by showing how crucial the Boychuk evidence was. I conclude by showing why it should never have been admitted.

### The Testimony Against Bighead.

Roxanne Bighead told this story on the witness stand: Until the second grade she lived with her grandparents. She then moved into a small trailer (12 by 60) with her parents and two brothers; there were only two bedrooms in the trailer. She lived in the trailer six years and then moved to a trailer park where she lived in a trailer in which she and her brothers each had their own rooms.

At the age of seven, when she was still living in the first trailer, her father touched her chest "in a way [she] didn't like." As she got older, the touching "progressed." When she was almost eight he put his fingers in her vagina; he subsequently, performed this act "a lot." When she was around nine, she rode with her father who was delivering fish to Sea–Tac Airport; on the way back on I–5, her father asked her to put her mouth on his penis; she did, and he gave her $5.00. After this occasion he performed this act with her "quite a bit. From there it went on to the next stage." The next stage, she said, occurred at an old Coast Guard station, to which her father drove her in the family van when she was nine or ten and inserted his penis in her vagina. After that, there were "other occasions inside and outside the house, on Moclips Highway, and also inside the trailer located at the trailer park," when he performed this act with her. At the time of these acts in the second trailer she was about twelve. On different occasions of this kind her father gave her $5.00 to $15.00. In April 1989, when she was thirteen, she was home alone sick. Her father entered her room in his underwear. She resisted him. He "went down toward my vagina area and put his mouth there." She was asked, "Did you do anything?" and she replied, "Yes, I tried peeing."

This testimony was crucial in relation to Count II of the indictment, which alleged "a sexual act, to wit, contact between the penis and the vulva." On direct examination, Roxanne made mention of no fact proving the charge. The district judge, out of the presence of the jury, told counsel: "I don't believe that I heard testimony supporting Count II.... [E]ither I am missing something, or you are missing something." Prompted by the court, and blaming herself for the omission, the prosecutor reopened the direct testimony of Roxanne, made reference to her prior testimony about the incident in April 1989, and asked, "Did he do anything else that time?" She answered: "Yes. He had also entered his penis into my vagina." She remembered the time, she said, "because I recall this as the last incident that had taken place between me and my father." A little later, however, she testified that on four

occasions in 1993 her father approached her for sex and on at least one occasion had tried touching her to obtain it.

From this conduct over a nine year period, all of it criminal if she was correct, the government selected two incidents to try as crimes: the incident at the old Coast Guard station, alleged by Count I of the indictment to have occurred when Roxanne was under the age of twelve, and the incident of April 1989. No physical corroboration was, of course, possible of these charges. No one in Roxanne's family was called as a witness. The only person saying that these events had taken place was Roxanne herself. She did provide information about the two trailers, the family van, and the old Coast Guard station, all of it showing familiarity with places or things familiar to her, none of it probative as to the acts with which her father was charged. A school companion, Kim Sasticum Eselin, testified that when she and Roxanne were about eleven, Roxanne said to her, "My dad was messing around with me." Roxanne's cousin and schoolmate Joanne Martin, testified that, when Roxanne was sixteen, she, Joanne, told her about an uncle, not the defendant, who had "stuck his penis in my vagina" and Roxanne had replied that her dad had done that to her when she was about seven and other times thereafter; the last time it had happened was when she came back home from Chemawa Indian School in Salem, Oregon (a school Roxanne attended in 1990–91 and 1991–92).

The events Roxanne testified to were set by her testimony against her family background. Of the two brothers who lived in the trailers with her and her parents, one, Charles, was two years her senior, and the other, Robert, was three years her junior. Her mother was, or became, an alcoholic. Her father was a strict disciplinarian, punishing the children physically and once injuring her eye in the course of doing so. After he became a tribal police officer when she was about thirteen, he wanted his children to be model citizens. He helped her with expenses when she twice went to boarding school and was concerned when she got involved with alcohol there.

In August 1989 her parents separated. She first went to live with her mother and then returned to the trailer with her father.

Her father brought home a new woman, Adele, whom he married in July 1993. Roxanne did not get along with Adele, had a fistfight with her, and "injured her in her face." Adele brought her own children into the trailer, whom she did not discipline despite Roxanne's efforts to get her to do so. Roxanne believed that Adele "had torn the relationship of my mother and father apart." Roxanne quarrelled with Adele "a lot" and argued with her father about her. She also quarrelled with her father about who owned the property on which the trailer was parked. The trailer had been given by the divorce court to her father, but he was a Yurok and the reservation where the trailer stood was Quinault and her mother was Quinault-enrolled and so, in Roxanne's view, "the lot belongs to my mother." When Roxanne was upset with Adele this topic would come up between Roxanne and her father.

Sometime in the spring of 1993 she developed a relation—at first only by telephone—with an officer in the Taholah Police Department where her father worked. Her father disapproved of him and the relation, but she became pregnant by him in August 1993 and eventually married him.

Roxanne first complained about her father's past conduct to a tribal police officer (not the one who was her friend) in April 1993. She was then seventeen. The last serious molestation she recalled had occurred four years earlier.

### The Evidence For Bighead.

Taking the stand in his own defense, Charles Luther Bighead, Jr. testified that for the last six years he had been an officer with the Taholah Police Department. He denied that he had ever had sexual intercourse with Roxanne. He testified that he and his wife Marlene separated in August 1989, and Roxanne had gone to live with her mother, but a month later Roxanne had called him and asked him to pick her up and bring her to live with him. The couple were divorced in 1991; he was given custody of the children. Roxanne then went to boarding school at Chemawa but within three months wanted to come back home with him. In 1993 when she was seventeen she started seeing the

police officer she eventually married, and her father became concerned that the developing relation would prevent her getting an education; her response to his interference was to get "rebellious" about it and to be angry at him.

In summary, Roxanne testified to serious sexual exploitation by her father from the age of seven to the age of thirteen and to at least one assault by him when she was sixteen. No corroboration was offered except her own vague allegation reported by Kim Sasticum Eselin and her own slightly more specific allegation reported by Joanne Martin, an allegation in conflict with her own testimony. Both brothers were available as witnesses and ready to testify to Roxanne's accusations which they heard after April 1993; this testimony was excluded as inadmissible hearsay. Neither brother was called to testify to any sign of sexual abuse when they had lived in close quarters or to any statement alleging such abuse before April 1993. There was undisputed evidence that Roxanne voluntarily chose to live with her father after the incidents and after she had twice been away to boarding school. There was undisputed evidence of her hatred of his new wife. There was undisputed evidence not only of her sympathy for her mother but of her desire to get the lot into her mother's name. There was undisputed evidence of her father's disapproval of her relationship with the police officer by whom she conceived a child in August 1993. There was undisputed evidence of the unabated tension between Roxanne and her father and stepmother which went back to 1989 and accumulated up to 1993.

### The Verdict.

The jury acquitted on Count I, the crime alleged to have happened at the old Coast Guard station. The jury convicted on Court II, the crime charged as happening in April 1989, reported by Roxanne four years later. It was in achieving that conviction that the testimony of Tasha Boychuk, called as the government's final witness, played its significant part.

### Tasha Boychuk's Credentials As An Expert.

Boychuk testified that she was the director of forensic services at the Children's Advocacy Center in Phoenix, Arizona. In 1993 or 1994 she had been licensed by the state of Arizona to be "a therapist." She held a bachelor's degree in nursing, received from the University of Alberta in 1981; a master's degree in psychiatric nursing, received in 1986; and a doctorate from an interdisciplinary program in law, sociology, social work, psychology, and nursing, received from Arizona State University in 1991. She was neither a psychologist nor a psychiatrist. The focus of her doctoral work "was regarding statements from children who had been sexually abused." In the past year she had been director of a research project "regarding child abuse on Indian Reservations throughout the United States." Prior to that she had been the director of a child abuse assessment center at St. Joseph's Hospital in Phoenix. Including part-time work, she had been "in the field of child abuse" since 1981. Between 1987 and 1993 she had "interviewed over 1,200 children who alleged sexual abuse." On cross-examination she was asked: "And with respect to these individuals that you have observed or interviewed, you made no conclusion, yourself, as to whether they had actually been abused, isn't that correct?" She answered: "That's correct."

### Tasha Boychuk's Testimony and Its Use By The Government.

On the basis of her experience, she was asked if she had "formed or made observations with respect to general aspects of reporting incidents of child sexual abuse." She replied that she had. She was asked what they were. She replied: "The most common circumstance with respect to reporting of sexual abuse is what is referred to as delayed disclosure." She added that this delay was "related to the characteristic of sexual abuse, meaning that most sexual abuse victims are molested by someone they know, in a position of authority and/or generally a caretaking position." She developed this point: "Certainly if children are most commonly

abused by someone they know, then the power differential between the victim and the offender is going to lend itself to chronic abuse over many years." She noted: "The most common age group for purposeful reporting of abuse is by adolescents and teenagers.... The most common situation ... is in the context of a conflicted family situation. What I mean by that is, generally, there is conflict in the family, and the teenager adolescent is angry, and the disclosure about the sexual abuse comes out. The most common scenario in these conflicted family situations is generally one of a troubled adolescent, so that the teenager has had some problems in the past that authority figures may not have aligned with this teenager." She further testified that "child sexual abuse is often chronic, it's very rarely an isolated, one-time event" and that therefore in reporting the abuse "the teenager develops something called script memory. What that means is that the events, over many, many years, blend together. And so in the recounting, or the telling of that event, you are going to get little bits and pieces of information, details that come to the person differently each time they recount the events." She emphasized: "[T]here is no research article or clinical anecdotal information that suggests that disclosure is anything but delayed."

Tasha Boychuk's testimony marvelously imparted strength to Roxanne's testimony:

1. It added credibility to Roxanne's account of chronic abuse over nine years.

2. It explained why Roxanne when first describing on the witness stand the April 1989 encounter had totally neglected to mention the crucial fact that sexual intercourse had occurred.

3. It explained why her story to Joanne Martin was in conflict with her trial testimony.

4. It effectively discounted the doubt that would naturally arise as to an angry, troubled, rebellious teenager's motives in a situation of high family tension: in Tasha Boychuk's world Roxanne appeared as exactly the kind of person who would allege sexual abuse because she had suffered it.

5. It accounted for, made normal, made unexceptional Roxanne's failure to report the abuse when she was no longer at home; her "delay disclosure," to use Tasha Boychuk's expression, was the delay that every victim of abuse created.

6. Above all, it moved the rape of Roxanne by her father from the extraordinary and unexpected to the usual, the quotidian experience observed by students of child abuse.

In Washington, as in a number of other states, the ordinary statute of limitations on charges of sexual abuse has been altered in favor of a child complaining as an adult. Rape may be prosecuted up to ten years after its commission if it is reported to a law enforcement agency within one year of its commission. RCW 9A.04.080(1)(b)(iii). If rape is not reported within one year, "the rape shall not be prosecuted." *Id.* But if the rape is of one under fourteen years of age, the rape may be prosecuted within seven years after its commission or three years after the victim's eighteenth birthday, whichever is later. The relaxed limitation of time places a burden on a defendant charged with the crime with which Charles Bighead was charged.

Such a defendant has only two defenses: to deny that the crime happened and to cast doubt on the credibility of his accuser. The alleged crime was secret. No one was there but the accuser and the accused. The accusations are so vague as to time and place that there is no way of checking the circumstances. The time for physical evidence of an assault is long past. There are no witnesses to whom the accuser complained contemporaneously. Once she has made her charge and the authorities believe it, the accused has to prove a negative: he did not do it. If his own denial is not enough, he must show why the accuser has a motive and demonstrate how implausible and inconsistent her story is. In this difficult situation, a witness who can bolster the accuser's charge is of great importance; when the witness comes in the guise of an expert the bolstering is doubled. The last point made by the prosecutor to the jury in rebuttal of the defense closing was this: "Mr. Lee told you that you cannot convict based on what an average person would have done. He mentioned the testimony of Tasha Boychuk and

some of the characteristics, general characteristics, that she told you about. But you can certainly consider that testimony in guiding your decision here today, and consider whether or not some of these general characteristics might not apply here." In this low-pitched, forceful way the prosecutor used Tasha Boychuk's account of the general characteristics of persons reporting sexual abuse as children in order to achieve the conviction of Charles Bighead.

But that account was inadmissible evidence.

### The Criteria of Admissibility.

The duty of the district court under Rule 702 of the Federal Rules of Evidence has been explicitly articulated by the United States Supreme Court: "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469 (1993). Rule 702 permits expert testimony pertaining to "scientific, technical or other specialized knowledge." "Scientific" implies "a grounding in the methods and procedures of science." *Id.* at 589–90, 113 S.Ct. at 2794–95. "Knowledge," the Supreme Court added, "connotes more than subjective belief or unsupported speculation"; the Supreme Court quoted the dictionary defining knowledge as "any body of known facts or ... any body of ideas inferred from such facts or accepted as truths on good grounds." *Id.* Expert testimony as to such knowledge is permitted only if it relates to an issue in the case. There must be a link between the expert's testimony and the matter to be proved. *Id.* at 591, 113 S.Ct. at 2795.

To carry out its duty, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. at 2796–97. Ordinarily a scientific theory will have been tested, and the test results reported. Usually the theory or technique will have been published by a scientific journal after peer review. Normally the court will be informed as to "the known or potential rate of error" in applica-

tion of theory. The degree of acceptance of the theory in the relevant scientific community will often bear on the court's assessment. *Id.* at 593–94, 113 S.Ct. at 2796–97. The court may be flexible in the tests it uses, but the court must test "evidentiary relevance and reliability" and its focus "must be solely on principles and methodology." *Id.* at 594–95, 113 S.Ct. at 2797–98.

The government argues that *Daubert* does not apply in this case. The government argues that *Daubert* only governs the admissibility of "novel scientific evidence" and does not extend to expert testimony "relating to other specialized knowledge based upon training and experience." The government relies on two pre-*Daubert* cases: *United States v. Hadley*, 918 F.2d 848, 853 (9th Cir.1990) (a psychiatrist permitted to testify as to "general behavior characteristics that may be exhibited in children who have been sexually abused"); followed by *United States v. Antone*, 981 F.2d 1059, 1062 (9th Cir.1992) (same).

The government reads *Daubert* too narrowly. As the quotations already made from it indicate, *Daubert* is an exposition of what is required for the admission of expert testimony as to "any body of knowledge." The "reasoning" or "methodology" of the expert must be examined by the court before the expert may be heard by the jury. Experts are not to testify to their subjective belief or unsupported speculation. The relevance and the reliability of their testimony, tested in terms of the principles they apply, must pass muster.

This circuit has not been clearly consistent in its references to *Daubert*. *See McKendall v. Crown Control Corp.*, 122 F.3d 803, 806 n. 1 (9th Cir.1997). In the context of a government agent's testimony on the modus operandi of narcotics traffickers we were willing to say that *Daubert* did not apply. *United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir.1997); *accord, United States v. Webb*, 115 F.3d 711, 714 (9th Cir.1997) (police expert testifying on concealment of weapons in engine compartments). But we have also explicitly declared: "*Daubert*'s holding applies to all expert testimony, not just testimony based on novel scientific methods." *South-*

*land Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir.1997) (survey conducted under accepted principles passes *Daubert*); accord, *Claar v. Burlington N.R. Co.*, 29 F.3d 499, 501 n. 2 (9th Cir.1994) (testimony on chemical exposure must meet *Daubert*). Whether or not these statements can be reconciled, Tasha Boychuk was offering testimony based on what is purportedly a novel scientific method as is apparent from the discussion, *infra*, of the Child Sexual Abuse Accommodation Syndrome. She was a subscriber to a very particular method of interpreting the alleged symptoms of alleged child abuse. She was using a special technique or model. She was not simply reciting her observations from years of experience. No principled line can be drawn between the kind of expertise offered by Tasha Boychuk and the other varieties of scientific expertise subject to the demanding criteria of *Daubert* so that valid inferences drawn from painstaking observations may be distinguished from pseudoscience.

### The Criteria Applied.

The transcript of Charles Bighead's trial shows nothing like the preliminary assessment of Tasha Boychuk's testimony required by *Daubert*. The government submitted her name and background in advance of trial; the defense moved in limine to exclude her testimony. The district judge expressed some skepticism about what that testimony would add. The government asserted that Boychuk had statistics to support her testimony on reporting patterns of child abuse in Indian communities. Such testimony and such statistics were not in fact produced at trial. The government insisted that "based on her years of experience and the numbers of children, vast, vast numbers of children she's interviewed, she certainly can talk about characteristics that are true for abused children."

The government had the burden of establishing the methodology by which Tasha Boychuk knew that she had been examining abused children. The government did not produce one scrap of evidence on this point. The government not only permitted, but insisted upon, the implication that children alleging sexual abuse were the same as children who had experienced it. An enormous leap was made to get over a gaping hole in the expert's knowledge. That the government could make this leap in good faith and that an experienced and careful trial judge could accept the leap underscore how easily the jury must have been confused and led to think that Tasha Boychuk knew about actual abuse rather than about allegations of its happening.

Her own admission that she had no means of knowing how many cases of actual abuse she had dealt with distinguishes still further, if further distinction is needed, this case from the pre-*Daubert* cases of *Hadley* and *Antone*. In each of those cases the expert was Dr. Charles Rosenzweig, a psychiatrist. By virtue of his profession when he testified as to the characteristics of the victims of child abuse it was apparently assumed that he had been able to identify actual victims; at all events, no objection was made that he was only testifying as to the general characteristics of those who complained about abuse. Not only was Tasha Boychuk not a psychiatrist and not a psychologist; she was the employee of an organization entitled "Children's Advocacy Center," and she herself was "the director of forensic services," a position oriented to achieving results for the Advocacy Center in the courts.

The government seeks to salvage its witness by observing on this appeal that Tasha Boychuk did not testify that Roxanne was credible nor did she relate her list of general characteristics to the facts of this case. Thus, the government contends, there was no improper bolstering of Roxanne's testimony.

It is true that by not specifically asking its witness about Roxanne's credibility the government avoided the error that led to reversal in *United States v. Binder*, 769 F.2d 595, 603 (9th Cir.1985) (experts testified that the children in the case who were allegedly abused could be believed). Avoidance of that error did not make Tasha Boychuk's evidence reliable and relevant. Unless what she testified to were the general characteristics of children who had suffered abuse, her testimony had no bearing on the case, yet functioned to insulate Roxanne from the normal challenges to credibility.

That the sexual abuse of children, even by those closest to them, occurs is a fact. That courts should be "sensitive to the difficulties attendant upon the prosecution" of the alleged abusers is an exhortation of the Supreme Court. *Tome v. United States*, 513 U.S. 150, 166, 115 S.Ct. 696, 705, 130 L.Ed.2d 574 (1995). But we are not to alter the rules of evidence to achieve convictions in cases of alleged abuse where the child is the only eyewitness. *Id.* (reversing conviction of a member of the Navaho Tribe for alleged abuse of his four-year-old daughter because the trial court admitted out-of-court statements made by the daughter after a motive to fabricate the accusations had arisen).

If the rules of evidence are relaxed in order to permit the successful prosecution of such cases, we gravely damage the rights of the accused and invite the repetition, in a new form, of the kind of justice associated with the witchcraft trials of seventeenth-century Salem, Massachusetts. In those famous and now abhorred proceedings, judges credited the accounts of children that they had been bewitched by the defendants. It was palpable to the judges that the accusers were suffering: they were suffering fits "beyond the Efficacy of any natural Distemper in the world." They would bark like dogs and purr like cats and sometimes declare they were in a red-hot oven and sometimes shiver because they said cold water had been thrown on them; other times they would cry out and tell that they were being beaten by cudgels. *See* Cotton Mather, *Memorable Providences, Relating to Witchcrafts and Possession* (1689), *reprinted in Narratives of The Witchcraft Cases 1648–1706* 107–108 (George Lincoln Burr ed., 1992) (detailing the afflictions of the four Goodwin children, aged 5 to 13). The judges had a belief, a theory, which explained these palpable phenomena in terms of witchcraft. The judges identified the witch and had her executed. *Id.* at 106. The analogy with the present case is this: "the general characteristics" of children believed to be under the spell of a witch were the principal evidence that witchcraft had taken place.

That accusations and complaints will become accepted as reality has been demonstrated today by the popularity of the idea that satanic cults are practiced in the United States and that children are sexually abused in the rituals of these cults. *See* Richard Ofshe & Ethan Watters, *Making Monsters. False Memories, Psychotherapy and Sexual Hysteria* 177–204 (1994). Over twelve percent of the members of the American Psychological Association surveyed in 1991 reported that they had treated one or more victims of such rituals; many psychologists reported treating dozens; one psychologist reported treating hundreds. *Id.* at 179. A quarter of the therapists in Tacoma and Seattle who were surveyed in 1988 had treated such cases of satanic ritual abuse or SRA as it became known. *See* Larry Wright, *Remembering Satan* 75 (1994). As Elizabeth Loftus, professor of psychology at the University of Washington, has observed, "Satan—a cunning, resourceful enemy who threatened the moral order of an entire society—was alive and well in Olympia, Washington." Elizabeth Loftus & Katherine Ketcham, *The Myth of Repressed Memory* 259 (1994). Loftus formally compares what went on there to the Salem trials. *Id.* at 227–63. If the standards applied in Charles Bighead's case were applied to a government prosecution of a satanic sexual ring, any of the psychologists with extensive experience in the treatment of alleged victims would be eligible to offer admissible evidence on "the general characteristics" of child victims of Satan and bolster the extraordinary tales a deluded child victim might retell.

The therapist believers in the existence of satanic cults which are engaged in child abuse are but a subset of a larger group of persons engaged in therapy who believe that they are able to evoke "repressed memory" and thereby enable their patients to understand and overcome present psychic disorders; in doing so the therapists lead their patients to accept and internalize the therapist's theory of what might have happened. *Making Monsters, supra*, at 4–9. The "repressed memory" therapists have flourished in a culture where, as in the seventeenth century England in which witchcraft trials proliferated, there has been great uncertainty about fundamental beliefs and values. In this America of the so-called sexual revolution, traditional restraints have tended to be displaced by a kind of new puritanism. At

the same time being a victim has become a popular calling; the most strategic role is that of victim. It is in the context of these cultural changes that statutes of limitations have been altered to benefit the delayed disclosures of childhood sexual abuse, that a journal has appeared with the title *Journal of Child Sexual Abuse,* and that those who have complained of such abuse are identified by their therapists as "victims" or, more dramatically, as "survivors."

Charles Bighead's case is not one of satanic ritual abuse, nor, while Roxanne's memory is critical in the case and that memory had been unexpressed for years, "repressed memory" has not been made an issue here. The analogues are of relevance only in showing the climate in which there have been strong popular pressures to relax the rules of law by which guilt is normally determined and innocence is guarded.

Richard A. Gardner, clinical professor of child psychiatry at the College of Physicians and Surgeons of Columbia University, has conducted an extensive examination of the kind of persons engaged in the kind of work that Tasha Boychuk is engaged in with the kind of credentials she possesses. He notes their remarkable bias toward belief in whatever stories the child victim tells them, their willingness to believe that children never lie, their use of what is actually normal as "indicators" of sexual abuse suffered by the children. *See* Gardner, *Sex Abuse Hysteria: Salem Witch Trials Revisited* 46–65 (1991). He believes that very many accusations of sexual abuse are true. *Id.* at 3. The difficulty is determining the true from the false. Acknowledging that there is a range of education, sensibility, and competence among such workers, *id.* at 113, his comprehensive assessment shows the need for close scrutiny, case by case, of the kind of expert who has come into existence and flourished in the cultural changes and tensions of the last quarter century. *Id.* at 81–84.

From a similar perspective—essentially sympathetic to the good-faith therapist—two law professors show how "ill-suited to translation in the legal forum" is the therapist's work of interpretation of symptoms of a patient. Cynthia Grant Bowman & Elizabeth Mertz, *A Dangerous Direction: Legal Intervention In Sexual Abuse Survivor Therapy,*

109 Harv. L.Rev. 549, 631 (1996). The likelihood is real that such therapists in good faith and in conformity with current fashion will cultivate a belief in the stories they are told, especially when the stance of the therapist is that what helps to heal is what is true. The danger is that what serves a patient well in recovering health will serve a court ill in determining guilt.

Roland C. Summit is the inventor of what is known among child abuse therapists as "the Child Sexual Abuse Accommodation Syndrome," a theory so familiar among these persons that it is known by its acronym CSAAS. Summit has declared: "Because we see it clinically, we see something we believe is real, clinically, and whether or not our colleagues, or the press, or scientists at large, or politicians, or local law enforcement agencies agree that it is real, most of us have some sort of personal sense that it is." *Making Monsters* at 195 (quoting a speech by Summit at a conference of therapists). Summit continues to be an embattled advocate of the syndrome he has discovered and named, as he vigorously denounces the courts that have excluded testimony of CSAAS. *See* Roland C. Summit, *Abuse of the Child Sexual Abuse Accommodation Syndrome,* J. Child Sexual Abuse 6, 153–63 (1992). He notes that his critics regard CSAAS as "dangerous pseudoscience." *Id.* at 153.

CSAAS has been examined by several courts in the context of criminal prosecutions, most notably by the Supreme Court of Pennsylvania. *See Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992). The defendant was convicted of the rape of his minor stepdaughter, a rape that occurred three years before she complained of it. The prosecutor employed the testimony of Susan Slade, like Tasha Boychuk a therapist who was neither a psychiatrist or psychologist, who testified "about behavior patterns in children who had been sexually abused"— how and why they delayed reporting an alleged offense, why they might not recall exact dates or details, how they experience a lot of anger toward the alleged offender; Slade did not relate any of testimony to the child in question. The Supreme Court of Pennsylvania reversed the conviction, holding

that Slade's testimony had been impermissibly used to bolster the credibility of the child. *Id.* at 831.

Identifying the testimony offered by Slade as testimony on CSAAS, the court noted the extensive scientific literature that doubted the very existence of CSAAS because of the lack of evidence that the behavior of sexually abused children differed from that of children who had not been sexually abused. *Id.* at 832. Two groups, in particular, could not be effectively differentiated from sexually abused children: children whose parents had divorced and children who had been physically but not sexually maltreated. *Id.* at 833–34. The symptoms of anger and of rebellion which Slade identified as symptomatic of abuse did not significantly distinguish the sexually abused child from other kinds of angry or rebellious children. *Id.* at 834. The court observed that Slade's testimony "does not render the desired inference more probable than not. It simply does not render any inference at all. Rather, it merely attempts—in contravention of the rules of evidence—to suggest that the victim was, in fact, exhibiting symptoms of sexual abuse." *Id.* The court concluded that it would not "simply disregard long-standing principles concerning the presumption of innocence and the proper admission of evidence in order to gain a greater number of convictions." *Id.* at 838.

The kind of testimony offered by Tasha Boychuk is not distinguishable from the testimony of Susan Slade found to be inadmissible. What is mandated by *Daubert* and by long-standing principles designed for the preservation of the rights of the accused and the determination of guilt is that Charles Bighead's conviction should not stand.