Filed 7/20/20

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B296380 |
| Plaintiff and Respondent, | (Super. Ct. No. 17CR03628) |
| | (Santa Barbara County) |
| v. | |
| FREDERICK LOUIS MUNCH, | |
| Defendant and Appellant. | |

Frederick Louis Munch appeals a judgment following his conviction of three counts of forcible lewd acts upon a child (Pen. Code, § 288, subd. (b)(1)); forcible sexual penetration (§ 289, subd. (a)(1)(B)); aggravated sexual assault on a child (§ 269, subd. (a)(5)); and four counts of lewd acts on a child (§ 288, subd. (a)). The trial court sentenced him to an aggregate determinate term of 26 years, plus a consecutive indeterminate term of 15 years to life in prison.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

Twenty-nine years ago, in *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300, our Supreme Court held that expert testimony on "the common reactions of child molestation victims," known as CSAAS, child sexual abuse accommodation syndrome, "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation."

Munch argues *McAlpin* is out of date. He contends that changes in the public perceptions of child abuse and decisions in other jurisdictions require us to reevaluate the prejudicial effect of CSAAS evidence.

In the published portion of this opinion, we discuss why CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse. We conclude the reasoning of *McAlpin* is as valid today as it was in 1991 and affirm.

                                  FACTS

The tawdry details of the facts of this case are not necessary for the published portion of our opinion. Suffice it to say that from the ages of six to 11 years, Jane Doe was subjected to various acts of sexual abuse by defendant Munch.

[[Jane Doe, 13 years old, testified Munch "used to babysit [her] when [she] was younger." Munch took care of her when her mother was working.

When Jane Doe was six years old, Munch "would touch" her "privates" – her "breasts" and "vagina." This occurred when she had her clothes on. She did not tell her mother. Munch told Jane Doe he would hurt her family "if [she] told anyone." On one occasion when she was six years old, Munch came into her room.

2

She testified, "[H]e laid me on the bed, and then he got on top of me." He held her hands above her head and tried to "put his penis into [her] vagina." He was unsuccessful because she was "squirming" away from him.

When she was seven, he repeated this conduct and unsuccessfully tried to put his penis in her vagina a couple of times while she was on the bed. He continued this conduct when she was eight, nine, and 10 years old. She did not tell her mother.

When she was nine or 10, on a couple of occasions, she and Munch would go to a "riverbed." Munch would "put his head down to [her] lower waist" and kiss her legs. He put his mouth on her vagina when her clothes were on. He touched her breasts and put his mouth on them. He put his mouth on her breasts when her clothes were on and when they were off.

When Jane Doe was 10 years old, Munch pushed her on the bed and held her hands. He was naked. He took off her clothes and rubbed her "private part" with his fingers. He touched the top part of her vagina. She saw his penis during the times he touched her vagina with his fingers.

When Jane Doe was 11 years old, Munch held her hands above her head and tried to have "sex with [her]." He took her clothes off. He was naked. His penis touched her vagina and he touched her breasts with his hands. He touched her vagina with his hands. He used his fingers to try to open it and "try to rub it." She fought him off by kicking him.

Shortly thereafter, on the same day, Jane Doe's mother walked in and saw Munch on the bed. When Munch saw Jane Doe's mother, he got up and went to the bathroom. Her mother saw Jane Doe trying to get dressed and "crying."

On cross-examination, Jane Doe testified that she wrote a letter to Munch when he was ill.  In that letter she said, among other things, "Love, love, love, love, love, love.  Do you know what that is?  Because I love you too much. . . .  I hope you feel better soon."  She wrote that when she was 10 years old.  She testified she wrote this letter because she was "expressing gratitude and friendship and love."  She also wrote a note with a picture of Munch for school.  In that note she referred to Munch as "my grandfather."  She wrote, "I call him Fred.  I love him because he takes me on . . . bike rides."  She was asked, "During your time with Mr. Munch, you grew to love him like a grandfather, didn't you?"  Jane Doe testified, "Yes, I did."]]

*Police Investigation*

In a search of Munch's residence, police found 150 photographs of Jane Doe.  Deputy Sheriff Jonathan Fleming testified that in one "selfie" photograph, Munch is "topless" standing near Jane Doe who "appears to be topless and in her underwear and looks to be pulling up her shorts."  She was holding her shorts "around the knee area."  In another photograph, Jane Doe is wearing "black tights or leggings" and a shirt with "see-through sleeves," and "part of her midriff is exposed."  In another, she is in "a ballet pose" with a label attached to the picture with the phrase "[l]ong and lean."  Another photo shows Jane Doe in a "denim top with no sleeves" and a skirt with her midriff exposed.  A label on the back of the photo contains the phrase "[l]ooking grown up at eight years."

On one of Munch's cell phones, there were 111 photos of Jane Doe.  On another, there were 84 photos.  In one of those photos, Jane Doe is in a "bathing suit" with a background of rocks

and pebbles.  In another, she is wearing "purple and yellowish colored shorts."

*Munch's Admissions to the Police*

During a police interview, Munch said he and Jane Doe "were affectionate" and related facts concerning his conduct with her.  [[They "had seen each other naked at various times."  He admitted "putting his mouth on her vagina over her clothes" when she was in the first or second grade.  He said he had touched "her vagina with his hand, both over her underwear and inside of her underwear."  He admitted touching her breasts "both with his hands and with his mouth."  He said he took these actions "at the request of Jane Doe," "regularly," like "a weekly thing."]]

*CSAAS Expert Testimony*

Anthony Urquiza, a psychologist, testified on the "characteristics of children who have been impacted by sexual abuse."  He said he had no information about this case other than the name of the defendant.  He was not testifying to "indicate whether or not sexual assaults took place or occurred here."

Urquiza testified that most children are sexually abused by someone with whom they have some preexisting relationship.  Some children "often have a tremendous sense of ambivalence because they may like the person who sexually abuses them, but not like being abused."  Abused children may often return to the abuser because they have learned to "compartmentalize and tolerate the experience of abuse" and may still "want to be around" the abuser.

Most child abuse victims have a significant delay in reporting abuse.  It may be months or years before they reveal it.  Abused children often "detach" themselves from those

5

experiences, do not appear to be distressed, and usually do not want to talk about the experience.  Abused children do not always "report the abuse the same way each time they talk about the abuse."

*Defense Case*

Munch testified that he was 70 years old and recovering from prostate cancer.  From December 1, 2016, to the time of his arrest, he had "difficulties with ejaculation and erection" and wore a "leg bag" during that period to "void" his bladder.  He began providing care for Jane Doe eight or nine years ago.

Munch testified that various acts over the years that occurred between Jane Doe and him were at her request.

[[Munch testified that when Jane Doe was in the second grade, she pushed his head between her legs and said, "That's your punishment."  On a later occasion, she kissed him on the lips.  When she was nine years old, she took his hand and put it "between her legs with her clothes on."  She pointed at his mouth and then pointed down "between her legs."  He did not discourage this activity because he thought "it was something she wanted [him] to do."  Munch testified, "I probably rubbed her or moved my hand around."  He did not go "under her clothing."  He said, "She liked it."

Munch said on another occasion that, "when she was changing," Jane Doe looked down at herself and "pointed to [his] mouth."  He said, "I put my mouth down there."  On two occasions, he "acquiesced in her demand and actually touched her" when she was wearing clothing because he "enjoyed being close with her and felt it was something she wanted."

Munch testified when Jane Doe was 10 or 11 years old, she developed a game called "milk and cookies."  "Milk" meant her

6

"breasts" and "cookies" meant her "vagina." She told him, "Make sure you get all the milk out before you have your cookies." This game involved him "touching her breasts or kissing her breasts." He was asked, "[D]id [the milk and cookies game] involve touching her private area?" Munch: "Usually, it meant mouth."

When asked about Jane Doe's testimony about his "sex play" with her at the riverbed, he responded, "It did happen." She was 10 years old at that time. He was asked, "Did anything of a sexual nature occur between you and Jane Doe on April the 10th, 2017?" Munch responded, "It might have. I don't have any specific recollection of it." He was asked, "Did anything of a sexual nature occur between you and Jane Doe on April the 12th, 2017?" Munch responded, "Yes." He said, "She liked to get on top, what I would call bump and grind. . . . I had my pants down and a shirt on, or shirt off and pants on . . . . We might have had milk and cookies too, but I don't remember exactly." On some occasions, Jane Doe was naked when he put his "mouth to her private area."

Munch testified that he did not "ejaculate while engaged in any sex play with Jane Doe." When engaged in sex play with her, his penis did not "penetrate her vagina, even slightly," and he did not "attempt to have sexual intercourse with [her]." He never "separated the labia with [his tongue]." He was asked, "[Y]ou never penetrated her vagina area with your tongue?" He responded, "Hum-um." He did not threaten Jane Doe with physical harm.]]

DISCUSSION

*Admission of CSAAS Evidence*

Munch contends the trial court erred by admitting expert testimony on CSAAS because it is irrelevant and "the public no

7

longer holds the presumed misconceptions this testimony purports to address." He claims he is entitled to a reversal of the judgment. We disagree.

Our Supreme Court has rejected Munch's contentions. It ruled that CSAAS evidence "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting – is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id*. at p. 1301.) Such evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*Id*. at p. 1300.) "The expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.) CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision.

Munch cites decisions from a small number of out-of-state courts that he claims reached a different result than *McAlpin*. He invites us to no longer follow *McAlpin*. We decline. That Supreme Court decision is binding on all lower courts in this state. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) That other jurisdictions may disagree with it does not change its impact on California cases. (*Ibid*.)

Moreover, California is not alone in admitting this expert testimony. In *McAlpin*, the court said, " 'The great majority of courts approve such expert rebuttal testimony.' " (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301.)

*New Trend to No Longer Admit CSAAS Evidence?*

Munch claims several jurisdictions have decided to no longer admit CSAAS evidence because they have discovered its deficiencies.  But many of the cases he cites from these jurisdictions do not support his position.

For example, Munch cites *Commonwealth v. Dunkle* (Penn. 1992) 602 A.2d 830 where the Pennsylvania Supreme Court ruled CSAAS evidence was inadmissible.  But after the *Dunkle* decision, the Pennsylvania Legislature passed a law "providing for the admissibility of this type of expert testimony." (*Commonwealth v. Olivo* (Penn. 2015) 127 A.3d 769, 780.)

Munch claims Washington has "held CSAAS evidence inadmissible."  He cites *State v. Maule* (Wash.Ct.App. 1983) 667 P.2d 96.  But in *State v. Jones* (Wash.Ct.App. 1993) 863 P.2d 85, 96, the court said, "More recent case law has brought into question the prohibition set forth in *Maule*."  They now approve "the use of expert testimony describing the behaviors of sexually abused children in general."  (*Ibid*.)

Munch cites a 1989 Ohio Court of Appeals case, *State v. Davis* (Ohio Ct.App. 1989) 581 N.E.2d 604.  But in 1998 the Ohio Supreme Court held, "An expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible . . . ."  (*State v. Stowers* (Ohio 1998) 690 N.E.2d 881, 883.)  " 'Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse.' "  (*Ibid*.)

Munch cites a Tennessee case, *State v. Schimpf* (Tenn.Crim.App. 1989) 782 S.W.2d 186, where the court held child sexual abuse expert testimony was inadmissible.  But there

the expert examined the victim and testified that the child "had, in fact, been sexually abused." (*Id.* at p. 193.) The court's ruling that this invaded the jury's province is consistent with *McAlpin*. Moreover, in *State v. Livingston* (Tenn. 1995) 907 S.W.2d 392, 395, the Tennessee Supreme Court recognized that " 'child victims, in particular, commonly are reluctant to report such incidents and delay in doing so, or fail to provide a full report." That is consistent with much of Urquiza's testimony here.

Munch cites the language from a 1997 dissenting opinion of a Ninth Circuit justice. But he does not mention that in 2003 the Ninth Circuit stated, "[W]e have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." (*Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 991.) This does not violate a defendant's right to due process. (*Ibid.*) Ninth Circuit decisions are consistent with *McAlpin*.

*New Jersey and Kentucky Cases*

Munch notes that in 2018 the New Jersey Supreme Court decided to no longer permit CSAAS expert testimony on all of Dr. Roland Summit's five common behaviors of sexually abused children: 1) secrecy, 2) helplessness, 3) accommodation, 4) delayed disclosure of abuse, and 5) recantation. (*State v. J.L.G.* (N.J. 2018) 190 A.3d 442, 451-452.) The court concluded that "only one type of behavior – delayed disclosure" had scientific acceptance. (*Id.* at p. 463.)

But *J.L.G.* involves an aberrant view of CSAAS derived from a contested hearing where four experts testified. Fishman and McKenna note the court used a "restrictive *Frye* 'general acceptance' test" that may not be persuasive in jurisdictions not

10

using that test, and "reasonable people can and no doubt will disagree as to the validity of the court's conclusions."  (Fishman & McKenna, *The Sharp Division as to the Admissibility of Expert Testimony; State v. J.L.G.*; 7 Jones on Evidence (July 2019 update) § 57:5, p. 5.)  The court was "overly dismissive of the 'accommodation' aspect of CSAAS."  (*Ibid.*)  It found accommodation "describes the straightforward *reality that all child victims cope with sexual abuse* in one way or another."  (*State v. J.L.G., supra*, 190 A.3d at p. 464, italics added.)  But it would not allow this "reality" to be presented to juries.

The *J.L.G.* court also ruled that recantation is not a sufficiently common behavior of sexually abused children to be mentioned during CSAAS testimony.  The court and some experts relied, in part, on a 2005 article that concluded only a tiny percentage of sexually abused children recant.  (London-Bruck et al., *Disclosure of Child Sexual Abuse, What Does the Research Tell Us About the Ways that Children Tell?* (Mar. 2005) 11 Psychol. Pub. Pol'y & Law 194 (PPP&L article).)

But this view has been challenged.  The PPP&L article's "conclusion regarding recantation rates has itself been challenged by other professionals who have likewise reviewed the empirical data."  (Parga, *Legal and Scientific Issues Surrounding Victim Recantation in Child Sexual Abuse Cases* (Spring 2008) 24 Ga.St.U.L.Rev. 779, 787.)  The PPP&L article discredited studies showing higher recantation rates on the theory that children in those studies may have lied about being abused.  But 1) a 2007 study of substantiated claims showed a recantation rate in the range of the studies the PPP&L article had rejected; 2) "strong empirical evidence exists to support the reality that sexually abused children do recant"; and 3) a "Gordon & Jaudes' study

11

illustrates a fifty percent recantation rate." (Shiu, *Unwarranted Skepticism: The Federal Courts' Treatment of Child Sexual Abuse Accommodation Syndrome* (Spring 2009) 18 So.Cal. Interdisc.L.J. 651, 672, 674, 675-676; Bochte, *The Double-Edged Sword of Justice: The Need for Prosecutors To Take Care of Child Victims* (Fall 2015) 35 Child. Legal Rts. J. 200, 213 [citing expert testimony showing "[b]etween thirty and forty percent of children recant"].) In addition to challenges to its statistical analysis, the PPP&L article's conclusion is also not consistent with the general view held by child abuse experts. (McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions* (Spring 1986) 77 Journal Crim. L. & Criminology 1, 61.)

Recantation is a well-established common behavior of child sexual abuse victims. (Peters, *Helpfulness of Expert Testimony - Expert Testimony on the Ultimate Issue, The Admissibility of Expert Testimony in Georgia* (Sept. 2019 Update) § 2:5, p. 1 [CSAAS "describes certain characteristics common to child victims of sexual abuse, including the fact that disclosure of the abuse may be delayed, equivocal, or retracted"]; Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb.L.Rev. 1, 87, 89-90; Cacciola, *The Admissibility of Expert Testimony in Infrafamily Child Sexual Abuse Cases* (1986) 34 UCLA L.Rev. 175, 188 ["After the child has disclosed the incident, it is not unusual for the child to deny later that the abuse occurred"]; *In re Tristan R.* (N.Y. 2009) 63 A.D.3d 1075, 1077 [child's recantation is " 'common among abused children' "]; *State v. Cain* (Minn.Ct.App. 1988) 427 N.W.2d 5, 8 [recantation "is a frequent characteristic of child abuse victims"]; *United States v. Miner* (8th Cir. 1997) 131 F.3d 1271, 1274 ["expert

12

testimony revealed that recantations are very common in child sexual abuse"].)  The "child's recanting of her statement to family members is not atypical in sex abuse cases." (*Myatt v. Hannigan* (10th Cir. 1990) 910 F.2d 680, 685, fn. 2.)  It is "particularly common when family members are involved." (*U.S. v. Provost* (8th Cir. 1992) 969 F.2d 617, 621.)  Moreover, unlike *J.L.G.*, 28 states permit testimony on Summit's CSAAS child victim behaviors. (*King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 535 [statistics in Abramson's dissent].)

Munch claims Kentucky courts uniformly exclude CSAAS evidence.  But there is a sharp disagreement between Kentucky Supreme Court justices over its admissibility.  In *Sanderson v. Commonwealt*h (Ky. 2009) 291 S.W.3d 610, the majority held it was inadmissible.  But two justices disagreed.  One urged the majority that "[t]he time is ripe to reconsider our position on CSAAS." (*Id.* at p. 616, conc. opn. of Abramson, J.)  The other justice said the majority was out of line with the modern judicial consensus about the admissibility of CSAAS evidence. (*Id.* at p. 617, dis. opn. of Scott, J.)  As one Kentucky jurist noted, Kentucky falls within the tiny minority of jurisdictions that do not recognize CSAAS.  He said, "Altogether, *forty-one states recognize the admissibility of CSAAS* expert testimony for some purpose." (*King v. Commonwealth, supra,* 472 S.W.3d at p. 535 [statistics in Abramson's dissent], italics added.)

Consequently, the vast majority of jurisdictions and many of the jurisdictions Munch highlights have rendered decisions that are consistent with *McAlpin*.

*Lack of Scientific Reliability*

Munch claims CSAAS evidence is inadmissible because its reliability was not initially evaluated under *Kelly/Frye* scientific reliability standards.

The People claim the CSAAS evidence is not subject to a *Kelly/Frye* analysis.  We agree.

"Under the *Kelly/Frye* test, when expert testimony based on a new scientific technique is offered, the proponent of the testimony must first establish the reliability of the method and the qualifications of the witness.  'Reliability of the evidence is established by showing "the procedure has been generally accepted . . . in the scientific community in which it developed . . . ." ' "  (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448.)

But here we are not dealing with *new* experimental scientific evidence " 'not previously accepted in court.' "  (*People v. Harlan, supra*, 222 Cal.App.3d at p. 449; *People v. Phillips* (1981) 122 Cal.App.3d 69, 87 ["We are not confronted here with the admissibility of evidence developed by some new scientific technique such as voiceprint identification"].)

The CSAAS evidence Munch challenges has been ruled to be properly admitted by the courts of this state for decades.  (*People v. McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; *People v. Julian* (2019) 34 Cal.App.5th 878, 885.)  Munch's claim regarding a requirement of scientific reliability testing for its admissibility is not meritorious because courts have long recognized the well-established relevance, necessity, reliability, and importance of this evidence.  (*Ibid.*; *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Housley* (1992) 6

Cal.App.4th 947, 955; *People v. Harlan, supra*, 222 Cal.App.3d at p. 449; *People v. Gray* (1986) 187 Cal.App.3d 213, 218-219; see also *Brodit v. Cambra, supra*, 350 F.3d at p. 991; *United States v. Bighead* (9th Cir. 1997) 128 F.3d 1329, 1330.)

The expert testimony here is "based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area." (*People v. Harlan, supra*, 222 Cal.App.3d at p. 449.) "The *Kelly/Frye* rule does not apply to this type of evidence." (*Ibid.*; *People v. Gray, supra*, 187 Cal.App.3d at pp. 218-219 [*Kelly/Frye* does not apply].) Such expert testimony meets "traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*]." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1161; see also *People v. McAlpin, supra*, 53 Cal.3d at pp. 1300-1301; *United States v. Bighead, supra*, 128 F.3d at p. 1330 [CSAAS evidence is admissible and *Frye* does not apply]; *State v. Jones, supra*, 863 P.2d 85, 99 [*Frye* does not bar CSAAS evidence "used to rebut an inference that certain behaviors of the victim . . . are inconsistent with abuse"].)

Moreover, Munch has ample means to challenge the validity of this expert testimony by cross-examination and making a voir dire examination of the expert's qualifications. The subject matter of this testimony may be challenged by examining the source materials and studies on which the expert relies. Here Munch's trial counsel cross-examined Urquiza regarding his compensation, his history of testifying for the prosecution, his contacts with the district attorney's office, and his knowledge of Summit's articles and conclusions regarding sexually abused children.

15

Here the CSAAS evidence was not being used as scientific proof that a child had, in fact, been abused.  On cross-examination, Urquiza agreed with the defense position that "there is no research-based clinical method to make a determination as to whether a child was abused or not."  That is a determination properly left to the triers of fact.

*The CALCRIM No. 1193 Instruction*

Munch claims the trial court erred by giving the jury a CALCRIM No. 1193 jury instruction.  We disagree.

The trial court instructed the jury:  "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse victims.  Dr. Anthony Urquiza's testimony about child sexual abuse victims is not evidence that the defendant committed any of the crimes charged against him.  *You may consider this evidence only* in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been molested, and *in evaluating the believability of their* testimony."  (Italics added.)

Munch contends this instruction reduces the prosecution's burden of proof because it "effectively instructs the jury that they may take [Urquiza's] testimony as evidence of the defendant's guilt."  He claims instructing jurors that they may use it "in evaluating the believability" of the child's testimony means they will improperly use it to find the defendant is guilty.

But we rejected these contentions in *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.  There we said, "The purpose of CSAAS is to understand a child's reactions when they have been abused.  [¶]  A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when

16

she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. *The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior.* Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid.*)

The trial court did not err in giving this instruction. It also gave a separate instruction during trial that the jurors could not consider CSAAS evidence as proof that Munch committed the charged crimes. The combination of that instruction with CALCRIM No. 1193 would not provide any reasonable juror grounds to believe CSAAS evidence could be used in the way Munch suggests. Moreover, any alleged error in giving the CALCRIM No. 1193 instruction would not constitute reversible error given the facts of this case. (*People v. Breverman* (1998) 19 Cal.4th 142, 173-176; *People v. Watson* (1956) 46 Cal.2d 818, 835-837.)

*Evidence Code Section 352*

Munch contends the expert testimony on CSAAS was "not relevant to any material issue in dispute" and the trial court erred by not excluding it because of its prejudicial impact. We disagree.

Evidence Code section 352 provides, in part, that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." " 'In applying section 352, "prejudicial" is not synonymous with

17

"damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) It involves evidence that tends to "evoke an emotional bias against the defendant . . . which has very little effect on the issues." (*Ibid*.)

Here on cross-examination Jane Doe testified about love letters she wrote to Munch and her long delay in reporting his conduct. The CSAAS evidence was relevant to advise jurors that such normally self-impeaching behavior is not unusual for sexually abused children. (*People v. McAlpin, supra*, 53 Cal.3d at p. 1300.)

Urquiza's testimony was relatively short and benign as compared to the highly relevant explicit details of the sexual offenses Jane Doe testified about. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) The potential prejudicial impact of Urquiza's testimony was also reduced because Urquiza testified that he knew no facts about this case. (*People v. Housley, supra*, 6 Cal.App.4th at pp. 955-956.) No reasonable juror could believe his testimony was an attempt to prove Munch committed the charged offenses. (*Ibid*.) Urquiza testified that he was not testifying to "indicate whether or not sexual assaults took place or occurred here." Before Urquiza testified, the trial court properly gave the jury a cautionary instruction. The court said, "This testimony is not evidence in any way that the defendant committed any of the crimes charged against him." We presume the jury followed this instruction. (*People v. Cain* (1995) 10 Cal.4th 1, 34.)

Moreover, Munch has not shown any reasonable probability of a different result had this evidence been excluded. (*People v. Watson, supra*, 46 Cal.2d at pp. 835-837.) Munch's admissions to the police and his trial testimony were highly incriminating.

They provided strong evidence showing his sexual relationship with the child, his motives, and his continuous participation in sexual acts with her. Munch testified that he knew that by disclosing the facts of his sexual relationship with Jane Doe to the detectives that he was "*admitting to a felony*." (Italics added.) His admissions to the police and his trial testimony, in significant part, corroborated Jane Doe's testimony against him. The jury could reasonably find any self-serving portions of his testimony were not credible. Munch admitted that he was not "entirely truthful" with police when he was initially questioned. He testified he initially was trying to hide the fact that he "had sexual contact" with the child. This showed his consciousness of guilt. (*People v. Cain, supra*, 10 Cal.4th at p. 34.)

We have reviewed Munch's remaining contentions and we conclude he has not shown grounds for reversal.

DISPOSITION

The judgment is affirmed.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

GILBERT, P. J.

We concur:

PERREN, J.

TANGEMAN, J.

19

John F. McGregor, Judge

Superior Court County of Santa Barbara

_____

Sanger Swysen & Dunkle, Stephen K. Dunkle for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.