**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Guillermo VALLEJO, Defendant–Appellant.**

**No. 99–50762.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 10, 2000

Filed Jan. 16, 2001

**1012**

Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

John N. Parmley, United States Attorney, San Diego, California, for the appellee.

Before: B. FLETCHER, THOMAS, and WARDLAW, Circuit Judges.

WARDLAW, Circuit Judge:

Guillermo Vallejo appeals his conviction under 21 U.S.C. §§ 841(a)(1), 952, and 960 for importation and possession with intent to distribute marijuana. We consider whether expert testimony detailing the structure of drug trafficking organizations may be routinely introduced in drug importation cases, regardless of whether the defendant is charged with a drug trafficking conspiracy or otherwise charged with membership in such an organization. Applying traditional evidentiary principles, we hold that expert testimony regarding the general structure and operations of drug trafficking organizations is inadmissible where the defendant is not charged with a conspiracy to import drugs or where such evidence is not otherwise probative of a matter properly before the court. We also conclude that (i) Vallejo knowingly and intelligently waived his *Miranda* rights; (ii) the district court abused its discretion by excluding both the expert testimony of Vallejo's school psychologist and the proffered evidence of third party culpability; and (iii) the district court abused its discretion when instructing the jury regarding the *mens rea* for a drug-importation offense. We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand to the district court for a new trial.

## I. Background

On March 4, 1999 at 7:30 in the morning, Vallejo was stopped while driving a white Honda by Customs Inspector Ronnie Jacinto at the Calexico port of entry between Mexico and the United States. Inspector

Jacinto testified that he was suspicious of the way Vallejo's hand shook when he handed over his ID and registration, of the way Vallejo followed Jacinto's movements in his rear-view mirror, and of the fact that there were no books or bookbags in his car despite Vallejo's claim that he was on his way to school. Inspector Jacinto therefore referred Vallejo to secondary inspection.

At secondary inspection, Customs Inspector Richard Valencia began questioning Vallejo in Spanish. Vallejo answered some of the questions in Spanish and some in English. Vallejo told the inspector that he had borrowed the car from his father's car lot in Mexicali, a lie to which Vallejo later admitted during Custom Agent Jay Pina's interrogation. While inspecting the car, Valencia discovered four packages of marijuana concealed under the back seat, four behind the back seat rest, three on each side of the car behind the rear quarter panels, and seven in the dashboard. Approximately 40 kilograms of marijuana were seized.

Around 9:50 a.m. Customs Agents Pina and Louie Garcia arrived to interrogate Vallejo. Vallejo told the agents that he spoke both English and Spanish, but did not express a preference. Agent Pina read him his *Miranda* rights in English, going into greater detail than was required by the DEA instructions for issuing *Miranda* warnings because of Vallejo's youth. Pina explained each right in English, phrasing the scope of the right in two different ways. Following each warning, Pina asked whether Vallejo understood and had him initial the DEA form next to the right of which he had just been advised. Once all the rights had been read and Vallejo's understanding of them had been confirmed, the questioning began.

The interrogation took place in both English and Spanish, with Agent Garcia interpreting when necessary. Vallejo told Pina that he was being paid $15 to import the car into the United States for Bebo, a man he had met at a swapmeet. He admitted to having lied at the border about driving the car for his father because he

did not want to be referred to secondary inspection and risk being late for school. Vallejo also told the agents that he had been visiting his girlfriend in Mexicali the previous day, and that he had spent the night at his aunt's house.

At trial, Vallejo testified that a friend of his, Francisco Harrera, had picked him up in the morning at his Aunt's house and driven him to meet Bebo. Vallejo had told Bebo that Francisco would also be willing to drive a car across the border, but there is some dispute as to why Francisco ultimately did not do so. Vallejo testified at trial that there was only one car to drive when they arrived, but Agent Pina remembered Vallejo telling him during the interrogation that Francisco had refused to drive because he believed the car contained drugs. At trial, Vallejo denied having made that statement.

During the three-day jury trial, there was extensive testimony regarding the process of importing used cars from the United States to Mexico, a business in which Vallejo's uncle and two of his cousins were involved. Auto dealers in Mexicali buy cars in the United States to be resold in Mexico. To be legally imported into Mexico, the car must be driven through a commercial port of entry, and if all the paperwork is not in order at that time, the Mexican authorities can seize the car. To avoid seizure, Mexicali auto dealers will often bring their cars to Mexico—without officially importing them—while waiting for the paperwork to be completed. When it is done, the car is driven back to the United States and then officially imported into Mexico through a commercial port of entry. Vallejo testified that he was driving the Honda back to the United States so that Bebo could import the car officially.

Expert testimony regarding the structure of drug trafficking organizations and the wages earned by drug couriers was also permitted at trial. Customs Agent Gordon Ajioka testified about how drug trafficking organizations divide responsibil-

ities among the people who grow, store, smuggle, and sell drugs. He also testified about the price at which marijuana can be sold in Mexico, its higher price in the United States, and the reasons for the discrepancy between the two. Later, during its rebuttal case, the Government called customs Agent Louie Garcia to testify regarding the amount of money couriers are paid to smuggle drugs into the United States from Mexico. The Government introduced this testimony to explain its theory of why Vallejo was found with a business card, the writing on which identified a Honda–like the car he was driving and stated a dollar amount of $700–800. The government believed the card identified the car to be used for drug importation and the price Vallejo would be paid. Vallejo, on the other hand, testified that the card identified a car he wanted to buy and its price.

The jury returned a guilty verdict on August 20, 1999, and Vallejo was sentenced to 21 months in custody to commence June 28, 2000, following completion of his senior year of high school. This timely appeal followed.

## II. *Miranda* Warning

■ As a preliminary matter, we must determine whether the district court clearly erred in finding that Vallejo knowingly and intelligently waived his *Miranda* rights. *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir.1998) (determinations that a defendant knowingly and intelligently waived his *Miranda* rights are reviewed for clear error); *United States v. Binder*, 769 F.2d 595, 598 (9th Cir.1985) (same). Vallejo argues that statements he made to Agent Pina during his interrogation should have been suppressed because he did not knowingly or intelligently waive his *Miranda* rights.

■ For a confession obtained during a custodial interrogation to be admissible, any waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). We look to the "totality of the circumstances including the background, experience, and conduct of defendant" in determining whether a waiver was valid. *Binder*, 769 F.2d at 599.

Vallejo analogizes his case to *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998), in which we held that Garibay had not knowingly or intelligently waived his *Miranda* rights. In that case, Garibay moved to suppress incriminating statements obtained after he had orally waived his *Miranda* rights on the ground that he had not understood the recitation of his rights in English. During the interrogation, the agent had to rephrase questions because Garibay did not understand them. Garibay was not given the option of speaking in Spanish nor was a Spanish-speaking agent present. *See Garibay*, 143 F.3d at 537. Additional evidence established that Spanish was Garibay's primary language, that he had a low verbal IQ, that he had received a D+ in eleventh and twelfth grade English, and that some people in his community did not believe that Garibay spoke English at all. *See id.* at 537–38.

This case presents a different factual situation. Vallejo was given the opportunity to speak in Spanish or English during his interrogation but did not express a preference. Agent Pina carefully explained each *Miranda* right to Vallejo, who confirmed his understanding orally and by signing his initials adjacent to each written right. Vallejo answered most of Agent Pina's questions in English, but a Spanish-speaking Agent, Agent Garcia, was present at all times to interpret when necessary. During the interrogation, Vallejo never indicated that he did not understand the questions being asked. Although Vallejo's native language is Spanish and he testified in Spanish at trial, he

testified in English without an interpreter at the evidentiary hearing to determine whether he knowingly waived his *Miranda* rights. During the hearing he appeared conversant and responsive to the district court in both direct and cross-examination. He needed clarification only one or two times. No evidence indicated that Vallejo spoke no English at all. Therefore, the district court did not clearly err in finding that Vallejo knowingly and intelligently waived his *Miranda* rights.

### III. Evidentiary Rulings

#### A. Expert Testimony of Drug Trafficking Organizations

##### 1. Agent Ajioka

■ Vallejo argues that the district court abused its discretion when, over his objection, it permitted the Government to introduce the expert testimony of Special Agent Ajioka regarding the structure of drug trafficking organizations.[1] *See United States v. Rahm,* 993 F.2d 1405, 1410 (9th Cir.1993) (reviewing a district court's evidentiary rulings for abuse of discretion). Vallejo was not charged with conspiracy to import drugs; nor did the Government introduce any evidence establishing a connection between Vallejo and a drug trafficking organization. The district court, nevertheless, permitted Agent Ajioka to testify about how such organizations operate:

> The drug business, from my experience is pretty compartmentalized. In other words, there are individuals who grow the product. In this case we're talking about marijuana. They grow the marijuana. There are individuals who buy it from the growers, store it. There are other individuals whose function in the venture is nothing more than to trans-

port the marijuana. So each step along the way incurs costs; costs of growing marijuana, costs of transporting it, the cost of storing it. And in transiting through a country—in this case we're dealing with Mexico. In transiting through Mexico there are other costs incurred along the way.

> When it gets to the border, the price has significantly increased since the time it left the marijuana grove. But in Mexico—it is not doing the traffickers any good in Mexico. The idea is to get it in the marketplace which for this particular product is the United States ...

> The seller, or the particular organization whose function is to transport the marijuana, does not know who the end user is going to be. His function is solely to transport the product from one point to another.

■ Evidence may not be admitted at trial unless it is relevant, as defined by Rule 401 of the Federal Rules of Evidence. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. The particular facts of the case determine the relevancy of a piece of evidence. *See* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 401.04[2][a] (Joseph M. McLaughlin ed., 2d ed. 2000) ("Relevance is not inherent in any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.").

We do not believe the expert testimony concerning the structure of drug trafficking organizations was relevant here. The

---

1. In *United States v. Campos,* 217 F.3d 707, 712–13 (9th Cir.2000), we held that it was not plain error to admit expert testimony that marijuana trafficking organizations do not use "unknowing couriers." However, we did so only on the basis that "[a]lthough we have not yet approved the use of such expert testimony in non-complex cases, we have not disapproved of it." *Id.* at 713. Therefore, we

reasoned that "because such evidence may be admitted in complex cases ... the district court did not plainly err in admitting it here." *Id.* In *Campos,* we specifically declined to decide "whether such expert testimony would be admissible in a non-complex case over a proper objection made in the trial court." *Id.* We do so here.

Government never articulated—either in its briefs or at oral argument—how the testimony was relevant to Vallejo's particular case.[2] When specifically questioned as to its relevance at oral argument, the Government explained that it now routinely introduces the structure of drug trafficking organizations in every drug importation prosecution to make up for the lack of fingerprints on the drugs in question. According to the Government, the absence of fingerprints is always raised by defendants as evidence that they did not put the drugs in the car and therefore did not know the drugs were there. Vallejo, however, had not indicated that he planned to, and in fact did not, raise the lack of fingerprint evidence as probative of his lack of knowledge.[3]

Nor did the district court articulate a clear rationale for admitting the testimony. Although it stated that "the rationale is pretty clear for that kind of evidence," the court did not discuss—and we cannot glean from the record—what that rationale was in Vallejo's case. "Even the most comprehensive evidence may not be admitted unless its significance to the proposition at issue can be ascertained." Weinstein & Burger, *supra* at § 401.04[2][d].

▮▮▮▮ In addition, although the Government has not asserted that it introduced the evidence to show Vallejo's knowledge, had that been the purpose, the district court should properly have excluded it under Rule 403 of the Federal Rules of Evidence. "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R.Evid. 403. If the district court "finds that the testimony would waste time, con-

fuse or not materially assist the trier of fact, or be better served through cross-examination or a comprehensive jury instruction," it has the discretion to exclude the testimony. *United States v. Hicks,* 103 F.3d 837, 847 (9th Cir.1996), *cert. denied,* 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997).

We have allowed "government agents or similar persons [to] testify as to the general practices of criminals to establish the defendants' modus operandi." *United States v. Johnson,* 735 F.2d 1200, 1202 (9th Cir.1984). Such testimony helps the trier of fact to understand how "combinations of seemingly innocuous events may indicate criminal behavior." *Id.; see United States v. Gil,* 58 F.3d 1414, 1422 (9th Cir.1995) (allowing "expert testimony that drug traffickers often employ counter-surveillance driving techniques, register cars in others' names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones" to establish defendants' modus operandi in the face of a Rule 403 challenge); *United States v. Maher,* 645 F.2d 780, 783 (9th Cir.1981) (allowing expert testimony that "Maher's activities were similar to the modus operandi of persons conducting countersurveillance while transporting drugs"). We have also allowed testimony about how criminal narcotics distribution organizations operate to help the jury understand a complex heroin distribution scheme involving twenty to twenty-five members of a structured criminal enterprise. *United States v. Patterson,* 819 F.2d 1495, 1507 (9th Cir.1987); *see also United States v. Cordoba,* 104 F.3d 225, 230 (9th Cir.1997)

---

**2.** Counsel's failure to articulate a rationale for allowing the evidence upon Vallejo's objection is in and of itself problematic. *See Harris v. United States,* 371 F.2d 365, 366 (9th Cir. 1967) (An objection to questioning may be sustained if counsel fails to articulate the question's relevance beyond simply stating that "it is essential for the defense of this client.").

**3.** In another drug importation case heard in the Southern District of California, the gov-

ernment also sought to introduce testimony regarding the structure of drug trafficking organizations against a defendant who was not charged with conspiracy to import drugs. There, the district court properly limited the testimony's admissibility, allowing it "only if the defense raised the issue of why no fingerprints were taken from the tire compartment [where the drugs were found] or its contents." *United States v. Alatorre,* 222 F.3d 1098, 1099 (9th Cir.2000).

("[The expert] testimony was properly admitted to assist the jury in understanding modus operandi in a complex criminal case.").

Agent Ajioka's testimony concerning the structure and modus operandi of drug trafficking organizations was not relevant to the Government's case against Vallejo. Nor was it needed to assist the jury's understanding of a complex criminal case. Agent Ajioka testified to the different roles played by various members of drug trafficking organizations, and although he did not cast Vallejo in a particular role, the implication of his testimony was that Vallejo had knowledge of how the entire organization operated, and thus knew he was carrying the drugs. To admit this testimony on the issue of knowledge, the only issue in the case, was unfairly prejudicial, and an abuse of discretion under Rule 403.

The improper use of testimony concerning the structure of drug trafficking organizations in this case is akin to the improper use of drug courier profiles. A drug courier profile is "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." *United States v. Lui*, 941 F.2d 844, 847 (9th Cir.1991) (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890, (1980) (per curiam) (quotation marks omitted)). The profiles are based on what investigating officers consider to be the most common characteristics of drug couriers—the characteristics they look for during investigations. *See id.* Such testimony is generally used to link the behavior of the defendant to the behavior common in the courier profile. Because " '[e]very defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity,' " we have not allowed such profiles to be introduced as "substantive evidence of a defendant's innocence or guilt." *Id.* (quoting *United States v. Beltran–Rios,* 878 F.2d 1208, 1210 (9th Cir. 1989)); *see Cordoba,* 104 F.3d at 230 (finding that the expert testimony involving drug trafficking was permissible because

"[n]one of the expert testimony in this case was admitted to demonstrate that Cordoba was guilty because he fit the characteristics of a certain drug courier profile"). Furthermore, "[d]rug courier profiles are inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers." *United States v. Beltran–Rios,* 878 F.2d at 1210 (alteration in original) (citation omitted).

Although the Government claims it was not trying to show Vallejo was a key player in a drug cartel, it portrayed him as a member of an enormous international drug trafficking organization and implied that he knew of the drugs in his car because of his role in that organization. This expert testimony connected seemingly innocent conduct to a vast drug empire, and through this connection, it unfairly attributed knowledge—the sole issue in the case—to Vallejo, a single individual, who was not alleged to be associated with a drug trafficking organization in even the most minor way. As a result, the introduction of this evidence created the same prejudice that has made drug courier profiles inadmissible. And, because the evidence was not relevant to Vallejo's particular case, it lacked any probative value.

█ Therefore, the district court abused its discretion when it allowed Agent Ajioka's testimony. Criminal prosecutions cannot be blueprinted, but must be tailored to the charges and facts of each case in consideration of the individual rights of each defendant. Because the expert testimony regarding drug trafficking organizations improperly and unfairly imputed specific knowledge to Vallejo and knowledge was the central question before the jury, we cannot say this error was harmless.

### 2. Agent Garcia

Vallejo also argues that the district court abused its discretion by allowing the Government to introduce the expert testimony of Agent Garcia concerning compensation rates for drug couriers. The Government offered this testimony to provide

an alternative explanation for Vallejo's possession of a business card describing a white, two-door, 1989 or 1990 Honda Accord with rims and excellent tires accompanied by the dollar value of $700–800. Vallejo testified that the card contained the description and price of a car he planned to purchase. The Government argued that the card described the white Honda driven by Vallejo and indicated the fee he would be paid for importing drugs in that car.

Agent Garcia testified:

If the load driver is just going to drive the car, cross the car, from, let's say, Mexicali to Calexico, and they're new members of the smuggling organization, they generally are paid anywhere between five and nine hundred dollars. If the load driver has been with the organization for some time, and his only role is to cross the car, again, into the U.S., they generally pay him anywhere from five to fifteen hundred dollars. If they're going beyond crossing the vehicle from Mexicali to Calexico, and transporting that vehicle, let's say final destination to Los Angeles, they're generally paid anywhere from fifteen to twenty-five hundred dollars.

 The district court did not abuse its discretion when it determined that Agent Garcia was a qualified expert witness. He had been a Customs Special Agent for ten years and had conducted over three to four hundred interviews with narcotics traffickers. He had interviewed at least one hundred and fifty individuals caught transporting drugs across the border and had asked them how much they were paid. He had worked undercover at least twenty-five to thirty times, and in that capacity, had learned what people were paid to drive marijuana across the border in the Imperial County area where Vallejo was stopped. Agent Garcia had also discussed this issue with confidential informants paid

to work for the United States Customs Service. Thus, Agent Garcia had significant experience dealing with marijuana drug couriers crossing into the United States.

 The district court, however, did abuse its discretion under Rule 403 by allowing Agent Garcia to testify regarding the fee paid to couriers within drug trafficking organizations. Although Agent Garcia's testimony as to payment rates for load carriers was, in and of itself, proper rebuttal testimony given Vallejo's testimony regarding the significance of the writing on the business card, the testimony as a whole was inadmissible for the same reasons as that of Agent Ajioka. This is because the payment amounts he testified to were again within the context of a large drug trafficking organization. In Agent Garcia's words:

new members of the smuggling organization . . . generally are paid anywhere between five and nine hundred dollars. If the load driver has been with the organization for some time . . . They generally pay him anywhere from five to fifteen hundred dollars.

This testimony, like Agent Ajioka's, improperly linked Vallejo to a vast drug trafficking organization, unfairly imputing the organization's knowledge of the drug in the cars to Vallejo. Because Agent Garcia's otherwise proper testimony as to the fees paid to drug couriers was inextricably intertwined with improper testimony as to drug trafficking organizations, the trial court abused its discretion by admitting it.

### B. Expert Testimony of the School Psychologist

Vallejo argues that the district court abused its discretion when it excluded the expert testimony of his high school's psychologist and director of special education at trial.[4] The expert was prepared to tes-

---

4. Vallejo did not offer this testimony in support of his motion to suppress statements he made during his initial interrogation, and thus this evidence was not before the district court when it held that Vallejo knowingly and

intelligently waive his *Miranda* rights. *See supra* Part II. We decline to speculate on how this testimony may have affected the outcome of that motion.

tify about Vallejo's long-standing, severe language disorder, documented by more than ten years of school and special education records, and the difficulties he experienced understanding and expressing English. The testimony was offered to explain the discrepancies between Vallejo's and the Agents' recollection of the communications which occurred during the interrogation.

The district court never clearly articulated why it excluded this evidence. First, the court appeared to misconstrue the import of the proposed testimony, stating, "I'm not going to permit a psychologist to say he would have been more comfortable [speaking] in Spanish." When Vallejo clarified that the proposed testimony was offered to explain how high school children like Vallejo cope with communication problems—especially in "pressure" situations like interrogations—the court was not swayed, ruling that the testimony was "totally irrelevant and remote." The court indicated that if Vallejo had trouble perceiving specific questions and answers, he might rule otherwise. Without specific examples, however, the court failed to see why answering interrogation questions was so complex or difficult that it required an expert's explanation. The court reasoned that determining what was actually said during the interrogation and the reasons for any discrepancies were matters that the jury could and should decide for itself. It was also reluctant to allow testimony from an expert who had never personally examined Vallejo.[5] Vallejo asserts that the proffered testimony was admissible under Rules 702 and 703 of the Federal Rules of Evidence, and was not rendered inadmissible by application of Rule 403. We agree.

**1. Rule 702**

■■■■ The proposed expert testimony was admissible under Rule 702. It provides:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). To be admissible, expert testimony must (1) address an issue beyond the common knowledge of the average layman, (2) be presented by a witness having sufficient expertise, and (3) assert a reasonable opinion given the state of the pertinent art or scientific knowledge. *United States v. Morales,* 108 F.3d 1031, 1038 (9th Cir.1997). The district court is accorded broad latitude in determining the reliability of expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The proposed testimony of the school psychologist addressed an issue beyond the common knowledge of the average layperson: the special problems that former special education students have when attempting to communicate in English in high pressure situations. His testimony would have explained how two people, like Vallejo and Agent Pina, could have very different perceptions of what occurred during the interrogation, yet could both be correct from a communications standpoint. The expert would have described Vallejo's communication difficulties to help the jury

---

**5.** The court said:

If you had an examining doctor who could give a medical opinion, psychological opinion, because of his examination of the Defendant, his IQ scores, and his testing that he's done with him—and I've permitted those people to testify.

This guy—this person hasn't done any of these things and I'm not going to permit him to start rambling off into the "toolies" about things that he doesn't know specifically apply to this Defendant or not. So the answer is no.

understand how he struggled to comprehend and communicate during the interrogation and why he appeared to struggle while testifying at trial.

There was no dispute that the witness had sufficient expertise, based on his degree in psychology and his current job as the High School's director of special education. The expert witness's opinion was reliable. In preparation for trial, as custodian of the school records, he extensively reviewed ten years of school documentation regarding Vallejo's language skills and his progress in special education classes. Although the district court, in its haste to find "closure," prevented defense counsel from fully explaining what the records contained, we can discern some of the records' contents from what defense counsel was permitted to argue. Apparently the records would have shown that Vallejo had been in special education classes since kindergarten, but that he had been taken out of those classes in the past couple years. The records would also have shown that Vallejo was in the lowest, i.e. the first, second, or third, percentiles in many verbal categories.

The First Circuit found similar testimony to be both relevant and reliable in *United States v. Shay,* 57 F.3d 126 (1st Cir.1995). Defending against charges of conspiracy and aiding and abetting an attempt to blow up his father's car, Shay sought to introduce expert testimony explaining that his inculpatory statements resulted from a mental disorder called "pseudologica fantastica," a condition which causes people to create intricate lies in order to place themselves in the center of attention. *See Shay,* 57 F.3d at 129–130. Although the district court excluded the testimony on the grounds that the jury could easily determine the reliability of Shay's statements by listening to the testimony of other trial witnesses, the First Circuit reversed, holding that the jury was unqualified to determine whether the false statements were made because the defendant suffered from a mental disorder. *See id.* at 133. Specifically, the expert testimony was needed to explain why the defendant would make "false statements even though they were inconsistent with his apparent self-interest" when "[c]ommon understanding conforms to the notion that a person ordinarily does not make untruthful inculpatory statements." *Id.*

We have also admitted expert testimony to explain inconsistencies in an individual's testimony. In *United States v. Bighead,* 128 F.3d 1329 (9th Cir.1997), we held that expert testimony regarding the characteristics of "delayed disclosure" and "script memory," commonly found in victims of child abuse, would assist the trier of fact in determining whether the victim was abused as a child and would not infringe on the jury's role of determining witness credibility. *Id* at 1330–31. We emphasized that "the jury was free to determine whether the victim delayed disclosure or simply fabricated the incidents." *Id.* at 1331.

Here, the expert testimony was intended to explain why Agent Pina remembered Vallejo saying that his friend, Francisco, decided not to drive Bebo's car because he suspected it contained drugs, while Vallejo claimed he never said such a thing. We agree with the First Circuit's reasoning in *Shay,* and conclude that the expert testimony was necessary to assist the jury in determining whether the inconsistencies resulted from Vallejo's recognized language difficulties. As we stated in *Bighead,* allowing the expert testimony would not displace the role of the jury because, after hearing the expert testimony, the jury was free to decide that the reason for the discrepancy was Vallejo's lack of credibility—not his communications disorder. We therefore hold that the expert testimony was admissible under Rule 702.

### 2. Rule 703

In addition to meeting the requirements of Rule 702, the basis for the expert opinion must be acceptable under Rule 703 of the Federal Rules of Evidence. It provides:

[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

One of the reasons the district court excluded the expert testimony of the school psychologist was his failure to personally examine Vallejo. However, the district court did not rely upon, nor does the government cite, any cases which require a psychological or medical expert's testimony to be based on a personal physical examination. In fact, the Supreme Court has explicitly held to the contrary. In *Daubert,* the Court stated that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786.

Following the Court's lead, we have allowed expert testimony regarding the memory difficulties experienced by child abuse victims even when the expert "did not testify about the facts of this case, or about the particular victim, whom she had never examined." *Bighead,* 128 F.3d at 1330. The expert's testimony was admissible because it "consisted of her observations of typical characteristics drawn from many years experience interviewing many, many persons, interviewed because they were purported victims of child abuse." *Id.*

■ In this case, the Government could have cross-examined the school psychologist regarding his failure to physically examine Vallejo, a fact which goes to the weight—not the admissibility—of the evidence. Vallejo's expert had reviewed ten years of educational and psychological documents concerning Vallejo prepared by school personnel, who taught and worked with Vallejo throughout his educational career and who had the opportunity to form objective and independent assessments of his special needs. These records, coupled with his in-court observations and his background in the field of psychology, provide a sufficient basis for expert testimony. We therefore hold that the expert testimony was admissible under rule 703.

### 3. Rule 403

■ Even when expert testimony is otherwise admissible, the district court may exclude it under Rule 403. The only issue before the jury was whether Vallejo knew that there were drugs in the car when he attempted to drive through the Calexico border. The Government's case relied heavily on the discrepancies between Vallejo's testimony and Agent Pina's testimony. The proposed expert testimony would have explained why these discrepancies may have occurred, and would have served to rehabilitate Vallejo on the key issue of knowledge.

The Government argues that the discrepancies did not need to be explained because Vallejo was simply lying. According to the Government, Vallejo could not have had difficulty communicating during the interrogation because the concepts were not complicated. The Government points out that Vallejo did not testify at trial that he was confused by the interrogation, nor did he specifically refer to a problematic statement or exchange.

■ The Government's arguments challenge the weight to be accorded of the expert's opinion rather than its admissibility. The Government does not argue that the testimony would have confused or misled the jury, nor does it argue any specific prejudice that may have resulted from the testimony. Although the Government implies that because the jury would not believe the expert, the testimony would be a waste of time, the credibility of the witness is a question precisely within the province of the jury. *See Mannino v. Int'l Mfg. Co.,* 650 F.2d 846, 853 (6th Cir.1981).

■ Because the Government does not advance any theory of prejudice that might outweigh the highly probative nature of the proffered expert testimony, we conclude that the district court abused its discretion by excluding it. As the testimony regarding Vallejo's ability to understand and communicate in English directly addressed the issue of Vallejo's knowledge, we hold the error was not harmless.[6]

## C. Evidence of Third–Party Culpability

■ Vallejo argues that the district court abused its discretion by excluding evidence that Jose Jaramillo, the former owner of the car Vallejo was driving, had previously been convicted of bringing the same amount of the same drugs into the country at the same port of entry using the same method of concealment in a different car.

The admissibility of this evidence was first raised during a motions in limine hearing when the Government sought an order preventing Vallejo from mentioning Jaramillo during opening statements. Vallejo explained that Jaramillo had purchased the car Vallejo was driving on January 22nd, been arrested in another vehicle on January 28th for importation of marijuana, and, on February 21st, an unknown person had executed a release of liability to transfer the car out of Jaramillo's name. Vallejo was stopped at the border on March 4th. He argued that there was "a clear inference" that Jaramillo had gotten this car ready to go and then sold it after his arrest, fearing that he would be caught importing drugs a second time. Because, at the time of the hearing, neither Vallejo nor the Government had complete information about what evidence would be used, the court postponed any decisions until after submission of written briefs.

The evidence was next brought up in a motion in limine on the first day of trial before the jury was seated. Although the Government did not object to naming Jaramillo as the car's owner, it did object to the introduction of Jaramillo's previous arrest for narcotics importation and his subsequent deportation on relevance grounds. The district court agreed with the Government and concluded that, without evidence of a connection between Jaramillo and Vallejo, "the fact that he's driving a car registered to somebody else could be susceptible to all kinds of inferences." Assuming that the evidence was too remote, the district court failed to ascribe importance to Vallejo's theory of disconnection as opposed to connection, nor did it allow Vallejo to fully explain why the timing of the transactions coupled with this disconnection was so critical to his theory of defense.

Vallejo again attempted to introduce evidence of Jaramillo's arrest during the re-cross-examination of Agent Pina, when the Government elicited testimony from Agent Pina that he had unsuccessfully tried to contact Jaramillo as the car's registered owner. The government having "opened the door," Vallejo argued that he should be allowed to inform the jury that contact with Jaramillo was impossible because Jaramillo had been arrested and deported for drug importation. For the third time, Vallejo explained the significance of the timing of Jaramillo's purchase of the car, his arrest for importing marijuana, the subsequent sale of the car, and Vallejo's arrest. Finally given the opportunity to fully discuss the details and timing of Jaramillo's arrest, Vallejo explained that Jaramillo was arrested at the same port of entry as Vallejo, and that almost the same amount of drugs was hidden in similar compartments of the car. He also explained that shortly after Jaramillo's arrest a release of liability was signed—in someone else's handwriting—relieving Jaramillo of the car's title. Yet for the third time, the

6. We therefore do not reach the question of whether Vallejo's Sixth Amendment right to present his own defense was violated. *See, e.g., Shay,* 57 F.3d at 131 n. 3 (holding that the Sixth Amendment "offers Shay Jr. no greater protection than the rules of evidence" and therefore not reaching the constitutional question).

district court failed to see how the proffered evidence connected to Vallejo and excluded it as irrelevant. The court cited Rule 403 as an additional ground for its exclusion, finding the evidence "more obfiscative [sic] than anything else."

We have held that "[f]undamental standards of relevancy ... require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged." *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir.1996) (alteration and omission in original) (citation and quotation marks omitted). In *Crosby*, we held that the district court improperly excluded evidence that suggested the assault victim's husband—not the defendant—may have been responsible for her assault because such evidence "supported an alternative theory of how the crime might have been committed." *Id.* at 1347. Here, the similarity of circumstances surrounding Jaramillo's arrest provides an alternative theory of how the drugs were secreted in Vallejo's car without his knowledge. Jaramillo was arrested one month and four days before Vallejo was arrested. Both were arrested for importing almost the same quantity of marijuana, hidden in similar car compartments, at the same port of entry. Ordinarily evidence of another person's similar arrest may be too remote, but here, the timing of the two arrests and the virtual identity of their circumstances, when combined with the fact of Jaramillo's prior ownership of the car Vallejo was driving, infuse this evidence with unique relevance to the central defense theory—that Vallejo did not know of the drugs in the car.

■ Even if the defense theory is purely speculative, as the district court characterized it, the evidence would be relevant. In the past, our decisions have been guided by the words of Professor Wigmore:

> [I]f the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely specu-

lative and fantastic but should afford the accused every opportunity to create that doubt.

*Id.* at 1349 (quoting 1A John Henry Wigmore, *Evidence in Trials at Common Law* § 139 (Tillers rev. ed.1983)) (alterations in original). Accordingly, it is the role of the jury to consider the evidence and determine whether it presents "all kinds of fantasy possibilities," as the district court concluded, or whether it presents legitimate alternative theories for how the crime occurred.

■ The Government also argues that the evidence was irrelevant because Vallejo could not establish a link between himself and Jaramillo. The Government, however, misapprehends the reason Vallejo proffered this evidence: to show disconnection. By showing that he did not know Jaramillo and that he did not know that Jaramillo had put drugs in the car, Vallejo hoped to establish his own lack of knowledge. This evidence was relevant.

■ Evidence of Jaramillo's previous arrest was also highly probative. Again, we can draw parallels to the *Crosby* case. In both situations, there was little direct evidence of what actually occurred. In *Crosby*, both the victim and the defendant were intoxicated on the night in question and could not recall exactly how the assault occurred. *See id.* at 1345. In this case, no evidence was presented to suggest exactly how the drugs ended up in the car Vallejo was driving. In *Crosby*, the defendant claimed he did not commit the crime, but he was not permitted to provide an answer to the question "the jurors would naturally ask themselves, 'If the defendant didn't [commit the crime], who did?'" *Id.* at 1347. In this case, Vallejo claimed he did not know there were drugs in the car, but he was not allowed to provide an answer for the jurors' question: "If defendant did not know there were drugs in the car and did not place them there himself, who did?"

■ On the other hand, there seems to be little danger of unfair prejudice here. The excluded evidence does not complicate the case; it simply supports Vallejo's claim that he did not know that there were drugs in the car. Because the government introduced evidence that Jaramillo was the car's registered owner, evidence of Jaramillo's previous arrest was relevant, and the danger of unfair prejudice did not substantially outweigh its probative value, the district court abused its discretion by excluding the circumstances of Jaramillo's arrest and deportation. Given the lack of direct evidence supporting Vallejo's conviction and the centrality of this evidence to Vallejo's case, the error was not harmless.

## IV. Jury Instructions

■ The statutes under which Vallejo was convicted, 21 U.S.C. §§ 841(a), 952, and 960, require the Government to prove that Vallejo knew that there were drugs in his car when he entered the United States.[7] Vallejo challenges the district court's erroneous instruction that to meet the requisite element of "knowledge," defendant need only have "suspected" marijuana was in the car, and argues that the curative instruction given by the court—that the parties "stipulated" to the standard of "knowledge"—only made matters worse. When reviewing a district court's jury instructions, the standard of review "turns on the nature of the error alleged." *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir.1997), *cert. denied*, 522 U.S. 968, 118 S.Ct. 417, 139 L.Ed.2d 319 (1997). We review jury instructions as a whole to determine whether they are misleading or inadequate to guide the jury's deliberation. *United States v. Frega*, 179 F.3d 793, 807 n. 16 (9th Cir.1999), *cert. denied*, 120 S.Ct. 1247 (2000). Although we review de novo whether a jury instruction misstates the elements of a statutory crime, *United*

*States v. Petrosian*, 126 F.3d 1232, 1233 n. 1 (9th Cir.1997), *cert. denied*, 522 U.S. 1138, 118 S.Ct. 1101, 140 L.Ed.2d 156 (1998); *United States v. King* 122 F.3d 808, 809 (9th Cir.1997), where, as here, the instructions "fairly and adequately covered the elements of the offense," we review the instruction's precise formulation for abuse of discretion. *Knapp*, 120 F.3d at 930.

Neither party disputes that knowledge of the drugs in the car was the required scienter. During closing arguments, however, the Government told the jury "you might think, well [Vallejo] either knew there were drugs in the car, or maybe he should have known that there were drugs in the car." The district court interrupted the Government's argument to correct the error, instructing the jury that "the precise test is that he knew that there were drugs or he suspected that there were drugs."

At the next break, Vallejo objected to the court's instruction as a misstatement of the law. Although the Government agreed that knowledge was required, the district court was not satisfied that this was the correct *mens rea*. As a compromise, the district court agreed to instruct the jury:

> The parties have agreed that—we're going to—this case with respect to the knowledge of the Defendant—remember when I told you, when I corrected Mr. Parmley, that you had to find that he either knew or suspected there were drugs? They've stipulated that the Government's proof shall be, and must be, that the Defendant knew, and that if he suspected, that's not enough. The Government and the defense have stipulated to that—proof.
>
> So, in this case, what you heard me say to Mr. Parmley—the Government is going to assume the burden of proving to

7. 21 U.S.C. § 841(a) makes it unlawful for "any person knowingly or intentionally" to possess with intent to manufacture, distribute, or dispense a controlled substance. 21 U.S.C. § 952 makes it unlawful "to import into the customs territory of the United States ... any

controlled substance ... or any narcotic drug." 21 U.S.C. § 960(a)(1) makes it unlawful to, "contrary to section 952 ... of this title, knowingly or intentionally import[ ] or export[ ] a controlled substance."

you beyond a reasonable doubt that the Defendant knew. Never mind that he just suspected. The burden of proof that the Government—is that Defendant knew there were drugs. So, to the extent that I said "knew or suspected," I want you to disregard the idea about he suspected.

Vallejo objected to this "stipulation" as an inaccurate statement of the law.

When giving the final jury instructions, the district court reiterated this version of the required mental state:

> The Government has stipulated that in this case it must establish beyond a reasonable doubt that the Defendant knew that there was marijuana in the car he was driving, and that it is not enough for the Government to prove that the Defendant suspected that there were drugs in the car. If the Government does not prove that the Defendant knew that there were drugs in the car, you must find the Defendant not guilty.

Vallejo proposed the following curative instruction:

> During the prosecutor's closing argument, I misstated the law to you. In correcting the prosecutor's statement of what the law is, I stated that the Government must establish that the Defendant knew or suspected that there was marijuana in the car he was driving. That is incorrect. It is not enough for the Government to prove that the defendant suspected that there were drugs in the car. Suspicion is not knowledge.

The Government must show that the Defendant knew that there were drugs in the car. If the Government does not prove that the Defendant knew that there were drugs in the car, you must find the Defendant not guilty.

The district court refused to give this instruction, believing its own instruction to be correct.[8]

 A district court abuses its discretion when it bases "its decision on an erroneous legal standard or on clearly erroneous factual findings." *FTC v. Affordable Media, L.L.C.*, 179 F.3d 1228, 1233 (9th Cir.1999). Here, Vallejo proposed an instruction that correctly reflected the law. The government conceded that this proposed instruction should have been given, but argues that because the correct elements were subsequently laid out for the jury, use of the word "stipulated" was not an abuse of discretion.

 Although "[a] defendant has no right to have a jury instructed precisely in the language he requests," *Charron v. United States*, 412 F.2d 657, 660 (9th Cir. 1969), in this case, the district court's choice of language altered the legal standard of knowledge to be applied by the jury. It is by force of law—not by "[a] voluntary agreement between opposing parties," *Black's Law Dictionary* 1427 (1999) (defining "stipulation"), that the government is required to prove the element of knowledge beyond a reasonable doubt. Because the applicable *mens rea*

---

**8.** Although district court judges are not required to give model jury instructions, the Ninth Circuit model instructions correctly state the law under 21 U.S.C. § 952 and 960, and were available for the court to give or use as a reference:

> In order for the defendant to be found guilty of that charged, the government must prove each of the following elements beyond a reasonable doubt:
> First, the defendant knowingly brought [marijuana] into the United States; and Second, the defendant knew that it was [marijuana] or some other prohibited drug.

*Ninth Circuit Manual of Model Jury Instructions Criminal* 389 (2000). The model in-

structions also provide the following definition for "knowingly," which the district court gave to the jury as court's instruction number 24.

> "An act is done knowingly if the defendant is aware of the act and does not [act] [fail to act] through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that [his][her] acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly."

*Id.* at 89.

standard had been misstated twice before the "stipulated" instruction was given and because knowledge of the drugs was the only issue in dispute, it was all the more imperative that the court clearly instruct the jury as to the correct law governing their deliberations on this point.

Furthermore, notwithstanding the error recited by the judge regarding mere suspicion, the jury could infer from the "stipulated" instruction that the proof of knowledge in this case was so unusually strong that the Government was willing to agree to the burden of proving an even higher standard of *mens rea* than ordinarily required. The court's later statement that "if the Government does not prove that Defendant knew that there were drugs in the car, you must find the Defendant not guilty," does not change the inference to be drawn from the "stipulated" instruction. Because suspicion is a degree of knowledge, the jury could have easily believed that suspicion was the requisite amount of knowledge under the judge's instruction. Even the standard instruction, given here, that the jury should "not read into these instructions or into anything the court may have said or done any suggestion as to what verdict you should return," did not serve to correct the error because the lesser *mens rea* standard was given as part of the jury instructions, and the court had told the jury "you must follow all of [my instructions] and not single out some and ignore others."

█ The Government does not argue that this error was harmless and thus waives that argument. We would nevertheless conclude that given the circumstances of this case, the instructional error as to the key element of knowledge was not harmless, and requires reversal.[9]

---

9. Because the district court's erroneous decisions to (i) allow expert testimony of drug trafficking organizations, (ii) exclude the expert testimony of Vallejo's school psychologist, (iii) exclude evidence of third-party cul-

### V. Conclusion

For the foregoing reasons, the decision of the district court is REVERSED and REMANDED for a new trial.

pability, and (iv) instruct the jury that knowledge was the stipulated mental state each provide independent grounds for reversal, we do not reach Vallejo's claim of cumulative error.