UNITED STATES of America, Plaintiff–Appellee,

v.

Javier VALENCIA–AMEZCUA, Defendant–Appellant.

No. 00–30365.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001.

Filed Jan. 22, 2002.

---

William S. Labahn, Eugene, OR, for defendant-appellant.

Pamela Holsinger, Assistant United States Attorney, Portland, OR, for plaintiff-appellee.

Before: HUG, T.G. NELSON and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

Javier Valencia–Amezcua appeals his conviction for manufacturing more than 500 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)(viii). He challenges the denial of his pre-trial motions to suppress evidence and the admission of expert testimony at trial. He also claims that sufficient evidence did not exist to support his conviction and that his sentence should be reversed in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

On January 24, 2000, two officers with the Tillamook, Oregon narcotics team, Sheriff Deputy Mark Groshong and Detective Neil Martin, observed suspected drug offender Juan Valencia–Rodriguez ("Valencia–Rodriguez") drive to a car wash and hand an envelope to a man who was under investigation for narcotics violations. Later that day, other Tillamook police officers conducted a traffic stop of this other man, and a search revealed that the envelope transferred by Valencia–Rodriguez contained methamphetamine. Meanwhile, Officers Groshong and Martin had stopped Valencia–Rodriguez after he left the car wash, and had questioned him. When asked what he was doing at the car wash, he said that he went there to vacuum his car. Still later that day, and understandably in light of the contraband found in the envelope given by Valencia–Rodriguez to the other man, Officer Groshong went to Valencia–Rodriguez's house where Valencia–Rodriguez told Officer Groshong that other adults were present and gave Groshong verbal permission to enter the house. Valencia–Rodriguez then led Groshong to an upstairs bedroom. There, the appellant, Javier Valencia–Amezcua ("Amezcua")[1] was found sitting on a bed with two other men. A television set in this room was turned off. Groshong asked the three men to go to the front porch.

---

1. It does not appear that Juan Valencia–Rodriguez (the occupant of the house) and Javier Valencia–Amezcua (the defendant-appellant) share a familial relationship.

On the porch, Groshong, Valencia–Rodriguez and his wife, Rosa, and the three men from the upstairs bedroom waited for other narcotics officers to arrive. After these other officers arrived, they obtained a written consent to search the house from both Javier and Rosa Valencia–Rodriguez. The officers then proceeded to conduct a search.

In a first floor bathroom, the officers found a man sitting in the dark, on the edge of the bathtub. A search of this bathroom revealed several bags of methamphetamine and a set of electronic scales. In a bedroom on the first floor, the officers found electric fryers, large plastic garbage cans and several cans of denatured alcohol, a substance used to make methamphetamine. In the upstairs bedroom where Amezcua and the other two men were found, the officers found a hidden door covered in wall paneling. The door was visible because it was partly open. This disguised door was blocked by the bed on which Amezcua and the two other men were sitting when first discovered by the officers. The officers moved the bed away from the wall and opened the hidden door. Lo and behold, they discovered a secret room complete with a five foot tall metal gas cylinder, several plastic tubs, and a large plastic storage container full of a suspicious white ground powder. Bolstered by the incriminating fruits of their initial search, the officers arrested Amezcua, the Valencia–Rodriguezes and the other men in the house on drug charges. The next day, state police officers conducted a more thorough search of the residence and surrounding premises with agents from the Drug Enforcement Agency ("DEA").

After he was arrested, Amezcua was taken to the local jail. There, his clothing was removed for inventory and chemical analysis. Cashier receipts for rubber gloves, multiple gallons of denatured alcohol, paper towels and ziploc bags were found inside his coat pocket and inventoried. Household goods of the quantity and type indicated on these receipts are commonly used to support methamphetamine lab operations. These receipts came from stores located near the residence listed on Amezcua's Mexican consulate and Oregon state identification cards, which had been found in his wallet. The receipts indicated that the items had been purchased two days before the search of the Valencia–Rodriguez house.

On February 10, 2000, Amezcua was charged with manufacturing methamphetamine (Count 1) and possession of methamphetamine with intent to distribute (Count 2), both counts in violation of 21 U.S.C. § 841(a)(1). Amezcua filed a motion to suppress the results of the chemical test of his clothes as evidence seized as a result of an illegal arrest. The district court granted the motion, finding that the officers lacked probable cause to arrest Amezcua on January 24. Amezcua later filed motions to suppress the ID cards and the coat pocket receipts. The district court denied these motions, holding that this evidence would have been inevitably discovered by agents from the Immigration and Naturalization Service ("INS"). The district court held that, if the officers had not arrested Amezcua on drug charges, they inevitably would have called INS agents to investigate Amezcua's immigration status. The district court concluded that the INS agents would have detained Amezcua on immigration violations, conducted a search of his wallet and coat pockets in the routine course of investigation, and found the challenged ID cards and receipts.

At trial the government called Juan and Rosa Valencia–Rodriguez to testify. Both alleged that Amezcua had taken part in

methamphetamine production at their house on January 24 and that he had been to their house on prior occasions. The government also proffered the expert testimony of a DEA agent who testified on the structure and operations of large-scale, clandestine methamphetamine labs. Throughout the trial, Amezcua claimed that he had been taken by a friend to the Valencia–Rodriguez house for the first time on January 24 and that he was not involved in drug production activity at the house. The jury returned a verdict convicting Amezcua of Count 1, manufacturing methamphetamine, and acquitting him of Count 2, possession with intent to distribute methamphetamine. Amezcua was sentenced to 151 months of imprisonment followed by a five-year period of supervised release.

■ Amezcua appeals, challenging, *inter alia*, the admission at trial of the coat pocket receipts and his ID cards as fruit of the poisonous tree following an illegal arrest. He asks us to hold that the district court erred in applying the inevitable discovery doctrine. Because we conclude that Amezcua's arrest was not illegal, we affirm the admissibility of the receipts and ID cards on a ground different than that relied upon by the district court.[2]

## II

### A. Probable Cause for Arrest

■ The dispositive issue for us is whether the narcotics officers made a legal arrest of Amezcua, after finding him in the upstairs bedroom of Valencia–Rodriguez's house. Whether the police had probable cause to arrest Amezcua is a mixed question of law and fact, which we review de novo. *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir.1999).

■ There is no doubt that police may arrest a person with out a warrant if the arrest is supported by probable cause. *See United States v. Hillison*, 733 F.2d 692, 697 (9th Cir.1984). Our precedent requires a conclusion that the officers had probable cause to arrest Amezcua if "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [Amezcua] had committed a crime." *United States v. Garza*, 980 F.2d 546, 550 (9th Cir.1992) (internal quotation marks and citations omitted).

■ It is also well established that the judgments made by law enforcement officers in the heat of their battle against crime need not be assessed in the abstract; weight may be given to the experienced judgment of the officers. As we have previously made clear: "In drug investigations, the court may consider the experience and expertise of the officers involved. This experience and expertise may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer." *Buckner*, 179 F.3d at 837 (citations omitted).

■ These legal principles are dispositive in assessing the legality of Amezcua's arrest. Here, the narcotics officers were presented with incriminating evidence encouraging them to arrest Amezcua. The officers had the consent of Valencia–Rodriguez to search his house. Valencia–Rodriguez was a suspected drug trafficker recently observed in a suspicious transaction. During the consented-to search, Amezcua

2. We may affirm the district court's decision to admit the coat pocket receipts and ID card on any ground supported by the record. *See*

*United States v. Gonzalez–Rincon*, 36 F.3d 859, 866 (9th Cir.1994).

was found in a bedroom with a hidden door covered in wall paneling. Amezcua was sitting with others just in front of the door on a bed that may have been placed there to obscure the door. Behind the hidden door lay a secret room, which contained tools, equipment and supplies illicitly used to make methamphetamine.

The district court found these facts insufficient to create probable cause for the arrest of Amezcua because (1) the methamphetamine lab equipment was hidden from view; (2) no methamphetamine odor emanated prior to the commencement of the search; and (3) none of the men on the bed appeared to exercise control over the house. The district court concluded that Amezcua's mere presence in the bedroom could not support a finding of probable cause. We disagree and hold that the evidence linking Amezcua to drug production activity was sufficient to create probable cause supporting his arrest.

█ It is well settled that mere presence with known drug offenders is insufficient to give probable cause for an arrest. *See Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (police lacked probable cause to arrest a person found talking to narcotics addicts and traffickers); *Ybarra v. Illinois*, 444 U.S. 85, 94–96, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (police lacked probable cause to search bar patron when police had warrant to search tavern and bartender; no criminal activity could be inferred from patron's mere presence in the bar). *See also United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir.1993) (police lacked probable cause to search automobile passenger when passenger was merely present in a car and driver admitted possession for personal use). Our decision is consistent with this precedent, and we do not depart from that principle. But this case presented more than evidence of mere presence.

In holding that Amezcua was merely present in the Rodriguez house, the district court incorrectly relied on our decision in *United States v. Robertson*, 833 F.2d 777, 782–83 (9th Cir.1987), where we held that police did not have probable cause to arrest a woman found on the premises of a house containing a methamphetamine lab. In that case, the police received an anonymous telephone call that a man named Johnson was operating a methamphetamine lab at his home. The police secured a warrant and then ventured to the Johnson house, where, upon arrival, the officers observed the defendant walking away from the house. The defendant was arrested outside the house as she was trying to leave the premises. *Id.* at 778–79. We held that the officers lacked "the slightest indication that [the defendant] was involved in criminal activity. Her mere presence on the premises, without more, [could not] support" a finding of probable cause for her arrest. *Id.* at 782.

*Robertson* is distinguishable and has no persuasive force here. The evidence linking Amezcua to the production of methamphetamine went beyond Amezcua's mere presence in the Valencia–Rodriguez house and his "propinquity to others independently suspected of criminal activity[.]" *Ybarra*, 444 U.S. at 91, 100 S.Ct. 338. During the course of their search, the narcotics officers recognized that the Valencia–Rodriguez house contained a large-scale methamphetamine production operation requiring the participation of several workers. Amezcua's proximity to the hidden door and his seated position with others on a bed, blocking entrance to the secret room, suggested that Amezcua had participated in the methamphetamine lab's activities and perhaps had exited the lab before the officers' arrival. That the men were obscuring the lab's secret door sug-

gested a purpose to deter the officers from its discovery.

■ Under the totality of the circumstances, a reasonable and prudent narcotics officer could believe that there was a fair probability that Amezcua was involved in criminal activity at the Valencia–Rodriguez house. *See Bettis v. United States,* 408 F.2d 563, 568 (9th Cir.1969) (proof of defendant's interest in contraband may be made based on his or her "relationship, attitude, conduct [and] utterance"); *United States v. Juvenile (RRA–A),* 229 F.3d 737, 743–44 (9th Cir.2000) (finding probable cause to arrest a passenger in a car loaded with drugs where the defendant's behavior at a border stop was meant to distract the officer from finding drugs in the car); *Buckner,* 179 F.3d at 839 (finding probable cause to arrest the sole passenger of a car containing 37 pounds of marijuana hidden in the car's dashboard and rear panels). Because Amezcua's initial arrest was not illegal, the challenged evidence cannot be excluded as fruit of the poisonous tree.[3]

### B. Expert Testimony of DEA Agent

■ Special Agent Debbie Podkoa, a veteran of the DEA with sixteen years of experience, investigated the Rodriguez house on the day after Amezcua was arrested. At trial she testified that (1) the house contained a large-scale methamphetamine lab requiring the participation of numerous workers and that (2) as a typical method of operation, large-scale manufacturers of methamphetamine do not allow uninvolved persons near their operations because of fear of theft. On appeal, Amezcua argued that this testimony was irrelevant and unfairly prejudicial. Because no objection was made to the DEA agent's testimony at trial, we may not give relief on this ground unless plain error is shown. *United States v. Vences,* 169 F.3d 611, 613 (9th Cir.1999). To review for plain error, Amezcua must establish error that was clear or obvious and affected his substantial rights. *Id.* Even after that showing is made, we then will exercise discretion to correct an error only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks and citations omitted).

■ As a general rule, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. As a more specific rule, pertinent here, it is commonplace that expert testimony regarding the structure of criminal enterprises is admissible to help the jury assess a defendant's involvement in that enterprise. *See United States v. Patterson,* 819 F.2d 1495, 1507 (9th Cir.1987); *see also United States v. Andersson,* 813 F.2d 1450, 1458 (9th Cir.1987). Government agents or other persons may "testify as to the general practices of criminals to establish the defendants' modus operandi." *United States v. Johnson,* 735 F.2d 1200, 1202 (9th Cir.1984). This evidence "helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous

---

**3.** Because we hold that probable cause existed to arrest Amezcua, we need not reach the issue of whether the district court erred in denying Amezcua's motion to suppress this evidence, as evidence seized as a result of an illegal arrest, based on the inevitable discovery doctrine. Given our view of the arrest, we have no occasion to assess inevitable discovery.

events may indicate criminal behavior." *Id.*[4]

Even when expert testimony is otherwise relevant and admissible, this "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..." Fed. R.Evid. 403. Amezcua makes no particularized argument on prejudice but merely combines his argument that the expert testimony was irrelevant with an assertion of prejudice. He is incorrect on both relevance and undue prejudice.

Here, the jury was presented with specific and detailed evidence on the structure and scope of the methamphetamine lab operations at the Valencia–Rodriguez house. They were tasked with a duty to decide whether Amezcua was involved or was merely an unknowing visitor. Agent Podkoa's general testimony on the aver-. sion of large-scale methamphetamine producers to allow unaffiliated individuals near clandestine operations was relevant to help the jury form a true and correct picture of the facts.

The admissibility of this expert testimony is persuasively supported by our several prior decisions endorsing the admission of modus operandi testimony and in particular those suggesting that drug traffickers generally do not entrust large quantities of drugs to unknowing transporters. *United States v. Murillo,* 255 F.3d 1169, 1176–77

(9th Cir.2001); *United States v. Alatorre,* 222 F.3d 1098, 1104, n. 8 (9th Cir.2000); *United States v. Campos,* 217 F.3d 707, 718–19 (9th Cir.2000) (Pregerson, J., concurring in part and dissenting in part). *See also United States v. Vallejo,* 237 F.3d 1008, 1016 (9th Cir.2001), *amended by* 246 F.3d 1150 (9th Cir.2001). We see no reason to disallow similar modus operandi testimony concerning the general structure and organization of large-scale methamphetamine labs where the defendant (1) claims to be an unknowing visitor to a house used for the large-scale manufacture of methamphetamine; (2) was positioned adjacent to a secret drug production facility; and (3) appeared to be cooperating to hide its presence. Agent Podkoa's expert testimony was relevant to show general modus operandi for methamphetamine labs, was probative of Amezcua's guilt from participation in the methamphetamine lab, and cannot be considered to be unduly prejudicial.

Amezcua erroneously argues that our decision in *United States v. Vallejo,* 237 F.3d 1008 (9th Cir.2001), *amended by* 246 F.3d 1150 (9th Cir.2001), requires in every case the exclusion of expert testimony on the structure of drug organizations where, as here, the defendant is not charged with conspiracy. Amezcua misreads *Vallejo* and is wrong because *Vallejo* expressly approved admissibility of modus operandi testimony.[5] *Id* at 1016.

---

4. *See also United States v. Gil,* 58 F.3d 1414, 1422 (9th Cir.1995) (allowing modus operandi testimony that "drug traffickers often employ counter-surveillance driving techniques, register cars in others' names, make narcotics and cash deliveries in public parking lots, and frequently use pagers and public telephones").

5. In *Vallejo,* the defendant was arrested at the Mexican border, his car found filled with marijuana. He was convicted of importation and possession of marijuana with the intent to

distribute. 237 F.3d at 1012–13. We reversed and remanded for a new trial, in part because the district court allowed a DEA agent to testify on a hypothetical drug importation operation although the government had not charged the defendant with conspiracy, linked the defendant to a drug organization, or alleged that the defendant was a drug smuggler. *Id.* at 1015–17. Amezcua relies on an introductory sentence in *Vallejo* that recites: "Applying traditional evidentiary principles, we hold that expert testimony regarding the general structure and operations

Agent Podkoa's testimony was directly relevant to rebut Amezcua's assertion that, although he was discovered adjacent to a secret methamphetamine lab at the Valencia–Rodriguez house, he had nothing to do with the drug production activities that occurred there. Agent Podkoa's expert testimony was admissible, for such weight as the jury might give it, and the district court did not commit plain error by failing to exclude it.

## C. Sufficiency of the Evidence

■■■■ Amezcua challenges his conviction on the ground that there was insufficient evidence to support the jury's verdict. We review the sufficiency of the evidence to support the conviction de novo. See United States v. Pacheco–Medina, 212 F.3d 1162, 1163 (9th Cir.2000). Sufficient evidence exists to support Amezcua's conviction if, considering the evidence in the light most favorable to the government, any rational trier of fact could have found Amezcua guilty of manufacturing methamphetamine beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); United States v. Angwin, 271 F.3d 786, 805 (9th Cir.2001).

■■■■ At trial the jury was presented with substantial evidence of large-scale methamphetamine production at the Valencia–Rodriguez house. The jury heard the testimony of DEA Agent Podkoa indirectly linking Amezcua to the methamphetamine operations. The jury heard the directly incriminating testimony of Juan and Rosa Valencia–Rodriguez who testified that Amezcua was at their house before and helped to make methamphetamine. The jury was also presented with powerful circumstantial evidence, the receipts for the purchase of household tools used in methamphetamine production, found in Amezcua's possession at the time of the arrest and showing purchases from stores near Amezcua's home. We hold that rational jurors could have found Amezcua guilty of manufacturing methamphetamine beyond a reasonable doubt.

## D. Drug Quantity Findings

Amezcua contends that the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), requires that his conviction and sentence be vacated because the jury did not make a specific drug quantity finding on its verdict form. This argument is without merit.

■■■■ In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348. Where, as here, a drug quantity finding may expose a defendant to an increased statutory maximum penalty, we require that the drug quantity must be submitted

of drug trafficking organizations is inadmissible where the defendant is not charged with a conspiracy to import drugs or where such evidence is not otherwise probative of a matter properly before the court." Id. at 1012. But this sentence does not accurately describe the holding in the text of the Vallejo opinion. Vallejo cannot reasonably be read so broadly as Amezcua asserts and, if the broad sentence cited was intended, it would be mere dictum as applied to other cases presenting different facts. Vallejo correctly holds that generalized expert testimony on the structure and operations of drug organizations cannot be admitted when the defendant is not charged with conspiracy and the expert testimony is not probative on any other issue. If Vallejo meant what Amezcua contends, it could not have endorsed the admissibility of modus operandi testimony in cases that did not charge conspiracy, a principle well established.

to the jury and proved beyond a reasonable doubt. *See United States v. Nordby,* 225 F.3d 1053, 1058–59 (9th Cir.2000). We have never held that *Apprendi* requires the drug quantity involved to be explicitly stated on the verdict form.

Count 1 of the indictment charged Amezcua with the manufacture of more than 500 grams of methamphetamine, and the trial judge explicitly instructed the jury that a conviction on this charge required a finding of at least that quantity. When the jury found Amezcua guilty of Count 1, it necessarily found beyond a reasonable doubt that Amezcua was guilty of manufacturing more than 500 grams of methamphetamine. As required by *Apprendi,* the drug quantity was properly submitted to the jury and proved beyond a reasonable doubt.

**AFFIRMED.**